1

2

3

4

5              IN THE UNITED STATES DISTRICT COURT

6              FOR THE EASTERN DISTRICT OF CALIFORNIA

7

8   TERRY HILLBLOOM, et al.,                    CASE NO. CV F 07-1467 LJO SMS

9              Plaintiffs,          **SUMMARY ADJUDICATION DECISION**
        vs.                          (Docs. 104, 112.)

10  COUNTY OF FRESNO, et al.,

11             Defendants.

12  _____/

13                          **INTRODUCTION**

14         Defendants County of Fresno ("County") and two of its peace officers[1] seek summary

15  adjudication on claims of unlawful entry, denial of medical care, conspiracy to cover up misconduct,

16  inadequate hiring, training and supervision, and infliction of emotional distress of plaintiffs Terry

17  Hillbloom ("Mr. Hillbloom"), Sandra Hillbloom ("Mrs. Hillbloom") and Michael Leon ("Michael").[2]

18  Plaintiffs respond that there is "ample evidence" to establish that defendants violated plaintiffs'

19  constitutional rights and to defeat qualified immunity and that defendants are liable under plaintiffs' state

20  law claims.  This Court considered defendants' summary adjudication motion on the record[3] without a

21  _____

22       [1]      The defendant peace officers are County Sheriff's Department ("Sheriff's Department") Deputy Robert
    Carey ("Deputy Carey") and Sergeant Eric Broughton ("Sgt. Broughton").  The County, Deputy Carey and Sgt. Broughton
23  will be referred to collectively as "defendants."

24       [2]      Mr. and Mrs. Hillbloom and Michael will be referred to collectively as "plaintiffs."  Mr. and Mrs.
    Hillbloom are married and the grandparents of Michael, age 19.
25

26       [3]      This Court carefully reviewed and considered all evidence, arguments, points and authorities, declarations,
    testimony, statements of undisputed facts and responses thereto, objections and other papers filed by the parties.  Omission
    of reference to evidence, an argument, document, objection or paper is not to be construed to the effect that this Court did
27  not consider the evidence, argument, document, objection or paper.  This Court thoroughly reviewed, considered and applied
    the evidence it deemed admissible, material and appropriate for summary adjudication.  This Court does not rule on
28  objections in a summary adjudication context, unless otherwise noted.

hearing, pursuant to Local Rule 230(g).  For the reasons discussed below, this Court GRANTS in part and DENIES in part summary adjudication on plaintiffs' claims.

### BACKGROUND

### Hiring Of Deputy Carey And Sgt. Broughton

Deputy Carey attended in 1992 at Fresno City College a police academy certified by the California Peace Officers Standards and Training ("POST").  In 1993, the Kerman Police Department hired Deputy Carey as a police officer and promoted him to sergeant in 1995.  The County Sheriff's Department ("Sheriff's Department") hired Deputy Carey in 1999.

Sgt. Broughton attended a POST-certified police academy at Allan Hancock College, Santa Maria, California, in 1986.  The Livingston Police Department hired Sgt. Broughton as police officer in 1986.  The Sheriff's Department hired Sgt. Broughton in 1997.

### Deputy Carey's Dispatch To And Entry Of Mr. And Mrs. Hillbloom's Home

On April 25, 2006 at about 8:16 p.m., Deputy Carey, unbeknownst to Mr. and Mrs. Hillbloom, was dispatched to their home near Parlier, California, regarding an out-of-control juvenile.  Kimberly Leon ("Ms. Leon"), Michael's mother and Mr. and Mrs. Hillbloom's daughter, was identified as the reporting party.  The Sheriff's Department dispatch informed Deputy Carey that Ms. Leon's son (Michael, then age 14) was at his grandmother's home and refused to leave for his home, that Ms. Leon had full custody of her son, and that there had been an ongoing problem with him attempting to stay at his grandmother's home.

Deputy Carey was in uniform, drove a marked Sheriff's Department patrol car, and arrived at Mr. and Mrs. Hillbloom's home at approximately 8:36 p.m.  When Deputy Carey arrived at the home, he either knocked at the front door or rang and doorbell and was greeted by Ms. Leon.  Ms. Leon informed Deputy Carey that she did not live at the home but granted his request to "come in."  Ms. Leon informed Deputy Carey that she experienced problems with Michael who did not want to leave and go home with Ms. Leon.  Ms. Leon explained that she had full custody of Michael and desired Michael to leave with her.  In his declaration, Deputy Carey recalls that "Ms. Leon invited me into the house, and

2

1   she allowed me to enter.  I entered the house with the intent to further my investigation, and did not have

2   the intent to either search or seize any persons."

3       Deputy Carey acknowledges that he "was aware this apparently was not Ms. Leon's home" and

4   further declares:

5       . . . I believed that Ms. Leon had authority to consent to me entering the house because
        she was the reporting party and apparently called from this location; the house was her
6       parents' house and she apparently had authority to be there since she was the person who
        answered the door; and Ms. Leon's son was also at the house.  Based upon the
7       circumstances presented at that point in time, I had no reason to believe Ms. Leon did not
        have authority to consent to his [sic] entering the house.

8

9   In response to a deposition question that he lacked probable cause, Deputy Carey responded: "That's

10  fair, yes."

11      After Deputy Carey entered the home, Michael failed to respond to Ms. Leon's twice calling him

12  to come to the door.  In his deposition, Michael attributes Ms. Leon to have said: "Michael, there is

13  somebody here that needs to see you."

14                      **Deputy Carey's Encounter With Mr. Hillbloom**

15      Deputy Carey and Ms. Leon proceeded through the living room to the kitchen where, according

16  to Ms. Leon, Deputy Carey "jumped in front of me."  Deputy Carey declares that Ms. Leon permitted

17  him to proceed down a hallway into a room where he was to speak with Michael.  Deputy Carey and Ms.

18  Leon proceeded toward the home's den area where Deputy Carey saw Michael sitting quietly at a table.

19  Mr. Hillbloom and Michael saw a figure's shadow proceed down the hallway.  According to Deputy

20  Carey, Mr. Hillbloom stood up from his nearby chair and told Deputy Carey to get out of the home.  Mr.

21  Hillbloom claims that he remained seated to that point and testified that "when I realized it was a police

22  officer, I was shocked, and I said, 'What are you doing here?  You don't have permission to be in my

23  house."

24      Deputy Carey responded that Ms. Leon had allowed him in the home and declares that "I was

25  not given a chance to explain why I was there."  Mr. Hillbloom testified that he informed Deputy Carey

26  that "Kimberely does not live here.  She does not have authority to let you in the house."  Mr. Hillbloom

27  claims he further told Deputy Carey: "Let's step outside and talk about whatever you are here for."

28      Deputy Carey suspected that Mr. Hillbloom was Ms. Leon's father and lived in the home but

3

1  "could not be certain because I was unable to confirm Mr. Hillbloom's identity" and lacked "an

2  opportunity to determine the identity and roles of all the individuals involved."  Deputy Carey further

3  declares:

> I considered the possibility that Ms. Leon's grandparents were encouraging Michael's
> refusal to go home with his mother, and that there could be a violation of a court order
> in that Ms. Leon had advised him [sic] that she had full custody of Michael, which
> nobody, including Mr. Hillbloom had disputed.  I was therefore unable to determine if
> Mr. Hillbloom had authority to order me out of the house especially in light of the fact
> that Ms. Leon had already given me authority to enter the house and den area.
>
> Additionally, Mr. Hillbloom's reaction to me simply entering the room created
> some exigency in my mind.  Without having been able to obtain sufficient information,
> I believed the situation to be somewhat unstable.  Further, in light of Mr. Hillbloom's
> reaction to my presence, I considered that Mr. Hillbloom was attempting to keep me
> from speaking to Michael to attempt to resolve the matter.

11  Deputy Carey concludes that "I did not believe it was reasonable to simply walk out of the residence and

12  leaving the situation behind."

13  Deputy Carey advanced within 18 inches of Mr. Hillbloom and told Mr. Hillbloom to sit down.

14  Deputy Carey claims that Mr. Hillbloom "appeared very angry" and refused to adhere to Deputy Carey's

15  instructions to sit down.  Mr. Hillbloom claims that he was seated for "much of the conversation" but

16  testified that he did not remain seated because "I wanted him out of my house."  Mrs. Hillbloom

17  confirms that Mr. Hillbloom stood up and "as the deputy was coming into the room . . . [Mr. Hillbloom]

18  continued to tell him to step outside to leave from inside the house."  Mr. Hillbloom notes that

19  "throughout my talking to him I was pointing to the nearest exit."  Ms. Leon attributes Mr. Hillbloom

20  to have instructed Michael to "go into another room."[4]

21  After Mr. Hillbloom refused Deputy Carey's directives to sit down, Deputy Carey proceeded to

22  restrain and handcuff Mr. Hillbloom.  Michael recounted the scene:

> I recall my grandfather was still having his hand up, and he was pointing.  And
> when he was shaking his hand, the officer grabbed his arm, pulled it behind his back,

---

27  [4]   In their opposition points and authorities, plaintiffs claim that Mr. Hillbloom remain "seated until it was
28  apparent that Deputy Carey was ignoring his requests that they speak outside; he remained within a foot of his chair and did
not block Carey' path to Michael; and, *he did not push or lay his hands on Deputy Carey*."  (Italics in original.)

1   swung him around to the fireplace, and had my grandfather up against the fireplace.[5]

2   The insulin pump of Mr. Hillbloom, an insulin-dependent diabetic, disconnected from Mr. Hillbloom's

3   body.[6]   Deputy Carey led Mr. Hillbloom out the home's front door with Mr. Hillbloom's wrists

4   handcuffed behind his back.  Mr. Hillbloom claims that Deputy Carey ignored his request to move the

5   handcuffs off a cut on his wrist.  Mr. Hillbloom further claims that when he informed Deputy Carey that

6   his insulin pump had disconnected, Deputy Carey responded: "I don't care."  Deputy Carey placed Mr.

7   Hillbloom in the back of his patrol car.

8                    **Sgt. Broughton's Arrival And Mr. Hillbloom's Insulin Pump Reinsertion**

9          Defendants note that at approximately 8:46 p.m., Deputy Carey had arrested Mr. Hillbloom for

10  violation of California Penal Code section 148(1), resisting, obstructing or delaying a peace officer.  At

11  approximately 8:51 p.m., Sgt. Broughton, Deputy Carey's immediate supervisor, responded to Deputy

12  Carey's request for assistance and arrived at the home after Mr. Hillbloom had been arrested and placed

13  into Deputy Carey's patrol car.  Deputy Carey testified that he requested a supervisor due to "the

14  possibility that it could result in a complaint because he was not cooperating with me at all."

15         Deputy Carey briefed Sgt. Broughton on Deputy Carey's version of preceding events to the effect

16  that Deputy Carey proceeded into Mr. and Mrs. Hillbloom's home after Michael was non-responsive

17  to Ms. Leon.  In his deposition, Sgt. Broughton further testified that "Mr. Hillbloom attempted to push

18  him, stop him, put his hands on his chest in some fashion.  When he attempted to arrest him, Mr.

19  Hillbloom struggled slightly resulting in an abrasion to his arm from the brick face of the . . . fireplace."

20         Sgt. Broughton testified that he tried to talk to Mr. Hillbloom who "was yelling . . . to be let out

21  of the car."  Mr. Hillbloom declares: "I told Sgt. Broughton as soon as he opened the door to the vehicle

22  . . . that it was urgently necessary that I be permitted to replace my insulin pump" which had

23  disconnected from his body during his arrest.  Sgt. Broughton described Mr. Hillbloom as "very agitated,

24  angry and very hostile, vocal."  Sgt. Broughton "left him in the car for a little while longer hoping to give

25  _____

26       [5]      In their opposition points and authorities, plaintiffs claim that "Deputy Carey grabbed his wrist; spun him
   around; twisted and pulled his wrist up his back and pushed him into the brick fireplace."

27

28       [6]      Plaintiffs repeatedly describe Mr. Hillbloom as "a 60-year-old insulin dependent diabetic."  Plaintiffs fail
   to indicate whether Mr. Hillbloom was age 60 as of April 25, 2006 or is currently age 60.

him some time to blow off steam so I could go back and try again." Sgt. Broughton estimates that he left Mr. Hillbloom in the patrol car for ten minutes before Sgt. Broughton returned. Mr. Hillbloom declares that Sgt. Broughton "returned 10 to 15 minutes after I first told him about the insulin pump, opened the door, and allowed me to step out of the car."

Mr. Hillbloom informed Mrs. Hillbloom that his insulin pump had come out of his body. Mrs. Hillbloom so informed either Deputy Carey or Sgt. Broughton that "Terry needs help here" and is "not being able to get insulin in his body." Mr. Hillbloom declares that he told Sgt. Broughton that Mr. Hillbloom "needed to go into the house to get supplies, and to perform the complicated procedure of filling the insulin cartridge and returning it to the pump," including testing blood sugar and calculating how insulin should be released. Mr. Hillbloom describes the calculations as "complicated" to require "a pencil and paper."

Mr. Hillbloom was not allowed to return to his home to insert his insulin pump. Mr. Hillbloom claims that Deputy Carey and Sgt. Broughton ignored Mr. Hillbloom's "repeated requests" to replace his insulin pump. Nonetheless, Michael retrieved a new insulin pump from the home.

Mr. Hillbloom declares that he needed to insert the new insulin pump "standing in the driveway, in the headlights of a car. I could not be sure that I had calculated correctly so that there would be sufficient insulin released immediately, or that the cartridge was free of bubbles." As to an insulin pump, Mr. Hillbloom testified: "You normally do it in a brightly lit area, hold it up to the light, look for any bubbles, bounce it, shoot the bubbles out to make sure there is [sic] no bubbles in it. I was provided a headlight off of a car, which did not enable me to do the precautions that we were taught to do when we change the infusion kit."

After Mr. Hillbloom inserted his infusion set, he was handcuffed again, placed in the patrol car and taken to the Reedley Police Department, where he was booked and released about midnight.

Mr. Hillbloom describes the insulin pump replacement as "urgently necessary" and claims an unlikelihood that "any local hospital would have the correct cartridge for my pump or infusion set." Mr. Hillbloom opines that "I should have been taken to an ER to check my ketone levels, and to attend to the cuts and abrasions I had received." Mr. Hillbloom notes he was not offered medical assistance after replacement of his insulin pump. Sgt. Broughton did not believe Mr. Hillbloom's condition was life

threatening because Mr. Hillbloom "was conscious, quite vigorously communicating with us."

Mr. Hillbloom did not request Deputy Carey or Sgt. Broughton to summon medical attention and did not seek medical attention after he was released from the Reedley Police Department. Mr. Hillbloom testified that his chief problem with Sgt. Broughton is that "he would not allow [me] to go to an appropriate area to reinsert my insulin." Mr. Hillbloom has no complaints of Sgt. Broughton's improper contact with Mr. Hillbloom.

In their declarations, Deputy Carey and Sgt. Broughton deny that they discussed "or came to any agreement to violate Mr. Hillbloom's constitutional rights, or any rights under federal or state law." In response to a deposition question whether Deputy Carey and Sgt. Broughton operated "on the assumption that Mr. Hillbloom would be detained until he was booked," Sgt. Broughton responded: "That's fair to say."

## Sgt. Broughton's Critical Incident Report

Sgt. Broughton prepared an April 26, 2006 Critical Incident Report ("CIR") regarding the preceding night's events. In the CIR, Sgt. Broughton stated:

1.  Mr. Hillbloom advanced toward Deputy Carey and "began pointing a television remote control within inches of Dep Carey's face";

2.  Mr. Hillbloom "continued to obstruct and delay Dep Carey in the performance of his duties";

3.  "Dep Carey tried to step around [Mr. Hillbloom] in order to speak with [Michael], at which point [Mr. Hillbloom] again stepped into his path, pushed Dep Carey in the chest with one hand and placed the remote control in his face with the other hand";

4.  Mr. Hillbloom "refused to follow Dep Carey's instructions and actively resisted by trying to pull away from him";

5.  Deputy Carey "described his efforts as 'begging him' to surrender";

6.  Deputy Carey said that Mrs. Hillbloom and Michael were telling Mr. Hillbloom "to stop resisting and to obey Dep Carey";

7.  "I attempted to speak with [Mr. Hillbloom], but he cursed at me";

8.  "I spoke with [Mrs. Hillbloom and Michael], who both reiterated the information that

7

1          Dep Carey relayed";

2      9.      "Both said they believed Dep Carey showed a great deal of restraint in the manner in

3              which he addressed [Mr. Hillbloom's] resistance";

4      10.     Mrs. Hillbloom described Mr. Hillbloom's demeanor as "outraged";

5      11.     "I spoke with [Ms. Leon], who told me that she comes and goes as she pleases from her

6              parents' home. She invited Dep Carey into the residence and expressed that she had the

7              right to do so. She said that her parents have custody of her daughter and she visits her

8              there."

9          Plaintiffs claim that Sgt. Broughton's CIR statements "fabricated facts to justify Deputy Carey's

10    conduct and his own conduct on the call." Mr. Hillbloom denies that he cursed at Sgt. Broughton. In

11    her declaration, Mrs. Hillbloom denies that Sgt. Broughton interviewed her on the night of Mr.

12    Hillbloom's arrest "about the events that had taken place" leading to the arrest. Mrs. Hillbloom declares:

13        Since he did not ask me about those events, I did not "reiterate" any information Deputy
          Carey may have relayed to him about them. In particular, I did not say I "believed Dep
14        Carey showed a great deal of restraint in the manner in which he addressed Terry's
          resistence." First, Deputy Carey did not show restraint, and I would never have said so.
15        Second, I did not characterize Terry's conduct as "resistance."

16        I did not perceive Terry to have been resisting Deputy Carey, so I would not have told
          him to "stop resisting"; I did not report to Sgt. Broughton that I had said any such thing.
17        Sgt. Broughton did not ask me about Terry's demeanor, and I did not say anything to him
          on that subject; I certainly did not say that Terry was "outraged."
18

19        Michael declares that after Mr. Hillbloom was driven away, "Sgt. Broughton never asked me

20    whether I wanted to go home. . . . If he asked me, I would have told him that my mother was at the time

21    living with a felon, who was verbally abusive, a drug user and kept pornography in the house." Michael

22    further declares:

23        On the night of the incident, Sgt. Broughton did not ask me anything at all about my
          grandfather's arrest. Neither on the night of the incident, nor any time after, did I have
24        any conversation with Sgt. Broughton on the basis of which he could say accurately . .
          . that I agreed with (or expressed any other opinion about) Deputy Carey's version of
25        how the arrest occurred.

26        I definitely did not tell Sgt. Broughton that I believed Deputy Carey showed "a great deal
          of restraint" in his manner of dealing with my grandfather. Deputy Carey did not show
27        restraint, and I would never have had any reason to say so, even if Sgt. Broughton had
          asked me – which he did not. I also did not describe my grandfather's behavior as
28        "resistance."

                                                    8

In addition, Ms. Leon challenges several of Sgt. Broughton's CIR statements.  She declares:

I do not recall Sgt. Broughton asking me about my right to be in my parents' house or to allow other people to come in.

If he had asked me, I would have told him that this was the first time I had been in my parents' house in a year, and that when I had last moved out, they had changed the locks and the alarm code.  I did not say to Sgt. Broughton that I "came and went as I pleased" from my parents' home; I still do not do that, I didn't do that at the time and I would not have told Sgt. Broughton that I did.

I did tell Sgt. Broughton that I invited Deputy Carey into my parents' residence, which is true.  However, it is not true and I did not say to Sgt. Broughton that I "expressed that I was within my rights" to invite Deputy Carey into the house.  Deputy Carey asked me if I lived there; I told him "no."  Deputy Carey did not ask me if I had permission to let him in; I did not express to him that I did, and I did not make any such statement to Sgt. Broughton.

Because Sgt. Broughton and I had no conversation on the subject, I did not tell him anything that he could truthfully say was in agreement with Deputy Carey's summary of the events that night.  (Underlining in original.)

### Mr. Hillbloom's Citizen's Complaint And Investigation

Mr. Hillbloom submitted a June 26, 2006 citizen's complaint to the Sheriff's Department to complain of "illegal entry," "use of excessive force," "unlawful arrest," and "filing false charges."  In his June 27, 2006 memo, Sheriff's Department Lieutenant Robert Kandarian notes that he spoke with Sgt. Broughton by telephone on June 26, 2006 and attributes Sgt. Broughton to say that Mrs. Hillbloom "also gave Deputy Carey permission to enter the house."

On June 29, 2006, Sgt. Broughton was assigned to investigate Mr. Hillbloom's complaint on a return to bureau basis (rather than by Internal Affairs) although he had been involved in the events at issue.  On July 27, 2006, Sgt. Broughton interviewed Mr. and Mrs. Hillbloom at their home but declined to interview Michael although Michael was available and willing to be interviewed.  Sgt. Broughton neither walked through Mr. and Mrs. Hillbloom's home nor contacted Ms. Leon.  Ms. Leon denies that Sgt. Broughton attempted to reach her by telephone.  Sgt. Broughton prepared an August 7, 2006 memo ("August 7 memo") for Sheriff's Department Lieutenant Mark Padilla ("Lt. Padilla") and which includes similar statements to those noted above in the CIR and addresses his July 27, 2006 interview with Mr. and Mrs. Hillbloom.  In the August 7 memo, Sgt. Broughton stated:

1.      After Mr. Hillbloom heard Ms. Leon call for Michael and Michael failed to respond, Mr. Hillbloom "then saw [Ms. Leon] and Dep Carey walking in the hallway";

2.   Mr. Hillbloom "said the deputy tried to speak several times, but [Mr. Hillbloom] 'talked over him', repeating that he did not have permission to be in the house and to leave";

3.   Mr. Hillbloom "did not recall if the deputy told him . . . to stop struggling. [Mr. Hillbloom] remembered his grandson (Michael) telling him to stop struggling";

4.   Mr. and Mrs. Hillbloom had "gained custody of their granddaughter (Kasey)";

5.   "I attempted to interview [Mr. Hillbloom directly after his arrest], but he refused to discuss the incident";

6.   Mrs. Hillbloom "said that she saw [Ms. Leon] and a Deputy Sheriff walking in the hallway, approaching the den."

7.   Mrs. Hillbloom "recognized the deputy's uniform as being law enforcement";

8.   Mrs. Hillbloom heard the deputy speak, but each time [Mr. Hillbloom] raised his voice more and ordered the deputy out of the house"; and

9.   Mrs. Hillbloom "did not specifically recall telling Terry to stop struggling or that she told me she believed Terry was out of control."

Similar to the CIR, plaintiffs claim that the August 7 memo "blatantly misrepresented the information the Hillblooms gave [Sgt. Broughton] about the events." Mr. Hillbloom disagrees with Sgt. Broughton's statements in his August 7 memo and points to omissions of the August 7 memo. Mr. Hillbloom declares:

I told Sgt. Broughton I saw only one person, and did not see until he came closer to the den that that person was wearing a uniform.

. . . I emphasized to Sgt. Broughton that between the time I first recognized Deputy Carey as law enforcement and the time he arrested me, I told him over and over that we could talk outside . . .

I told Sgt. Broughton that at first I did not stand from my chair, but was surprised, and merely told Deputy Carey we could talk outside. I told Sgt. Broughton that only after Deputy Carey kept advancing toward the den did I stand from the chair. I told Sgt. Broughton I was pointing with the remote to the exits, not at Deputy Carey, and I stayed within one foot of that chair. I told Sgt. Broughton that I did not push Deputy Carey, or lay hands on him at all. . . .

I did not tell Sgt. Broughton that I "talked over" Deputy Carey as he was trying to explain why he was in the home – Deputy Carey did not try to explain his presence in my home. . . .

. . . I have no recollection of Deputy Carey telling me to stop struggling, so I would not

10

1   have reported such a thing to Sgt. Broughton.  I told Sgt. Broughton that Deputy Carey
2   never tried to step around me, and that I never pushed or touched Deputy Carey.  I did
    <u>not</u> tell Sgt. Broughton that my grandson Michael had told me to stop struggling.

3   Mrs. Hillbloom further takes exception with the August 7 memo and declares:

4   . . . I did not see [Ms. Leon] in the hallway with [Deputy Carey], and did not tell Sgt.
    Broughton that I did.  Sgt. Broughton states I recognized Deputy Carey to be a Deputy
5   Sheriff while he was still in the hallway; I did not.  In fact, I did not see Deputy Carey at
    all until he appeared near the doorway of the den; at that point, I saw him, and his
6   uniform. . . .

7   I did not tell Sgt. Broughton that each time the deputy began to speak, Terry interrupted
    him and "raised his voice more."  Rather, at no time did I hear the deputy even make any
8   effort to explain why he was in our house without our permission; he just kept ordering
    [Mr. Hillbloom] to sit down.
9
    I did not tell Sgt. Broughton that I "did not specifically recall" telling [Mr. Hillbloom]
10  to "stop struggling," or describing Terry as "out of control."  On the contrary, I told Sgt.
    Broughton I <u>had not</u> made those statements, since they were not accurate descriptions of
11  what I saw.  (Underling in original.)

12      In his August 7 memo, Sgt. Broughton "recommended a finding of 'Exonerated', as I conclude

13  that the incident did occur and Dep Carey's actions were within law and policy."

14                       **Criminal Action Against Mr. Hillbloom**

15      On June 27, 2006, the County's District Attorney's Office filed a complaint against Mr.

16  Hillbloom for violation of California Penal Code section 148(a)(1) (resist, obstruct or delay a peace

17  officer).  Mr. Hillbloom's criminal defense counsel apparently filed a motion to suppress evidence of

18  Mr. Hillbloom's alleged conduct toward Deputy Carey inside his home based on Deputy Carey's illegal

19  entry into the home.  At a suppression hearing, the presiding judge noted that Deputy Carey was inside

20  the home "without a warrant, without consent, and without exigent circumstances."  The District

21  Attorney's office dismissed the criminal action against Mr. Hillbloom.

22                         **Plaintiffs' Emotional Distress**

23      Plaintiffs neither sought nor intend to seek treatment from a mental health professional regarding

24  the events at issue in this action.  Nonetheless, Mr. Hillbloom testified that he experiences bi-weekly

25  dreams in which he "relive[s] the event" and "wake[s] up and it's uncomfortable."  He further testified

26  that the "incident has totally disrupted my confidence . . . when I unexpectedly come upon a police

27  officer. . . . I am afraid that I am going to become a victim of something."  Mrs. Hillbloom testified that

28  her "biggest" concern is whether the Sheriff's Department would respond or respond timely to a call at

                                        11

1   her home.

2          Michael has lived with Mr. and Mrs. Hillbloom since June 2006 and has not discussed with Mrs.

3   Hillbloom stress arising from the events at issue in this action.   Michael acknowledges that he

4   experienced "a lot of stress growing up" but as to the events at issue he feels "really bad" for Mr. and

5   Mrs. Hillbloom.   In his deposition, he testified that he experiences "[n]ervousness when I see sheriff's

6   around my house, because the boats patrol there [nearby on the Kings River], but that's pretty much it."

7          Plaintiffs point to their interrogatory responses to highlight their emotional distress.   As to "the

8   time of incident," Mr. Hillbloom claims "fright and anxiety concerning continuing assault by Carey;

9   anxiety, fright, nervousness and worry what inmates may do to me if Carey acted on his threat to book

10  me into the Fresno County Jail; mortification and shock resulting from the realization that my home is

11  not a safe haven for me, my wife, my grandchildren or invited guests."   Turning to "since the incident,"

12  Mr. Hillbloom claims "distrust and fear of unknown law enforcement personnel, somatic symptoms of

13  which are anxiety, nervousness, light sweating and slight shakiness; nightmares and trouble sleeping for

14  the first several weeks after the incident; humiliation and indignity of having the event chronicled in the

15  Fresno Bee, and having to answer 'yes' when asked if I have ever been arrested."

16         In her interrogatory response, Mrs. Hillbloom characterizes Deputy Carey's conduct as "extreme,

17  intimidating and frightening" to generate concern "for what my grandkids were seeing as well as what

18  was happening to my husband."   Mrs. Hillbloom claims distress to see "blood running down" Mr.

19  Hillbloom's arm and "shock to suddenly see my husband being treated like a criminal in our own home."

20  Mrs. Hillbloom claims further distress from delay to allow Mr. Hillbloom to insert a new insulin pump

21  and claims a lost "trust and respect for law enforcement" and new found discomfort "in calling on law

22  enforcement for help" to increase anxiety "about our personal safety."   Mrs. Hillbloom notes that since

23  April 25, 2006, she continues to experience "off and on" "trouble sleeping" and remaining awake

24  "thinking about this."

25         In his interrogatory response, Michael characterizes Mr. and Mrs. Hillbloom's home as "a safe

26  refuge for all my life" and claims that "[w]itnessing defendant Carey enter my grandparents' home and

27  attack my grandpa has forever destroyed the security I felt there."   As a result of the events at issue,

28  Michael claims "distrust of people in authority" including law enforcement and teachers.   Michael fears

12

that law enforcement will not judge him "fairly" and vulnerability "that my family and I are at risk because we have no protection against officers abusing their authority."

### Sheriff's Department Hiring Practices[7]

Asst. Sheriff Gattie declares: "At no time relevant to this lawsuit did the Fresno County Sheriff's Department have a custom, policy or practice of improperly screening or hiring applicants for employment as Fresno County deputy sheriffs." Asst. Sheriff Gattie further declares that prior to and at the times of hiring Deputy Carey in 1999 and Sgt. Broughton in 1997, the Sheriff's Department "maintained policies and practices to ensure the hiring of qualified candidates as deputy sheriffs" in compliance with POST guidelines. Prior to and at the time of Deputy Carey's hiring, the Sheriff's Department had what Asst. Sheriff Gattie characterizes as "a stringent selection process" including:

1.  Screening of an applicant's completed employment application by County Personnel Services;

2.  A background investigation by an investigator who attended a POST-certified course for background investigations;

3.  Completion of a "personal history statement" to require personal data, relatives and references, education, residential history, employment background, military service, financial status, legal history, and motor vehicle operation history;

4.  Interview with background investigator, including review of information provided in personal history statement;

5.  Polygraph examination, including questions regarding drug and alcohol use, criminal history, etc., and administered by a certified polygraph examiner;

6.  Interviews of applicant's relatives, neighbors, landlords and past employers into employment, military and criminal history, financial issues, etc.;

7.  Review of applicant's personnel file of other employing law enforcement agencies to address commendations, evaluations, Internal Affairs investigations, disciplinary actions, etc.

---

[7]     The following attributes of the Sheriff's Department hiring practices is derived generally from Assistant Sheriff Thomas Gattie's ("Asst. Sheriff Gattie's") declaration.

8.      Attempt to locate and review court and police records related to criminal history;

9.      Attempt to locate and review "relevant documents," including military records, driver's license, marriage certificates, divorce papers, etc.;

10.     Attempt to locate and review history of vehicle accidents or motor vehicle violations;

11.     Obtaining criminal history from Department of Justice; and

12.     Physical and psychological examinations.

The background investigator prepares a summary of findings that includes positive or negative issues of significance.  The human resources lieutenant reviews the summary, recommends whether to hire the applicant, and forwards the package to the administrative captain who also makes a hiring recommendation and forwards it to the Sheriff.  The Sheriff makes the final hiring decision.[8]

Anyone in the review process may request from the background investigator additional information or areas of inquiry concerning the applicant.  If an applicant has made multiple applications to the Sheriff's Department, a new background investigation is conducted for subsequent applications. Depending on the time span between applications, either a new background summary or an addendum to the original summary is prepared.

The hiring practices described above were in place prior to the 1997 hiring of Sgt. Broughton and the 1999 hiring of Deputy Carey.  Asst. Sheriff Gattie declares that "[t]here was no information received during the Fresno Sheriff's Department background investigation of either [Deputy Carey or Sgt. Broughton] that would preclude them from being hired as a peace officer in the State of California." Plaintiffs note that Deputy Carey's background investigation revealed "prior arrests and convictions for assaultive behavior, admitted drug use, and other conduct signaling unfitness for law enforcement work."

/ / /

/ / /

---

[8]      Plaintiffs claim that although former County Sheriff Richard Pierce ("Sheriff Pierce") "was technically the final decision maker, he did not actually exercise his independent judgment . . . but deferred to the recommendations of his subordinates, who in reality made the final decision."  Plaintiffs point to Sheriff Pierce's deposition testimony that "I put a great deal of weight on the job people do that worked for me."  Defendants respond that "Sheriff Pierce may have relied on others, but the final decision was his to make."

**Sheriff's Department Training Practices**[9]

Lt. Ko declares that at the time of events at issue in this action, the Sheriff's Department maintained a policy "to comply with the minimum training requirements for peace officers in the State of California mandated by POST," which is "recognized as the authority that governs the training of peace officers in California."[10]

Sheriff's Department deputies are required to attend a POST-certified academy and receive ongoing training in compliance with POST standards. Deputies receive training consistent with policies and legal standards on use of force, arrest, entry onto private property, first aid, and report writing.

On initial hiring, deputies undergo a 14- to 16-week field training program. New deputies are placed with three experienced training officers during the program in which they are instructed on Sheriff's Department policies and procedures and relevant standards concerning use of force, arrest, entry onto private property, first aid, and report writing. During the program, deputies are evaluated daily.

Deputies receive on-the-job training and attend advance officer courses and classes and seminars throughout California. According to Lt. Ko, the Sheriff's Department training unit "ensures deputy sheriffs receive training in compliance with POST" and at the time relevant to this action, the Sheriff's Department "either met or exceeded POST minimum training guidelines." The Sheriff's Department practice is to provide a specific deputy particular identified training as needed. Lt. Ko concludes that as of April 25, 2006, Deputy Carey and Sgt. Broughton "were in compliance with POST and Fresno Sheriff's Department training requirements."

/ / /

/ / /

/ / /

/ / /

---

[9]     The following attributes of the Sheriff's Department training practices is derived generally from the declaration of Sheriff's Department Lieutenant Richard Ko ("Lt. Ko"), who during 2005-2009 served as commander of the Sheriff's Department's training unit.

[10]    The following attributes of the Sheriff's Department Training Practices is derived generally from Lt. Ko's declaration.

1

**<u>Sheriff's Department Supervision</u>**[11]

2

***Probation, Evaluations, Polices And Procedures***

3      At the time of the hiring of Deputy Carey and Sgt. Broughton, new deputies were on a one-year

4 probation and received monthly evaluations.  At the time of events at issue, all deputies were supervised

5 through a chain of command running from sergeant, lieutenant, captain, assistant sheriff and sheriff.

6 Deputies were supervised daily by sergeants, their immediate supervisors, and/or senior deputies.

7      At the time of the events at issue, the Fresno Sheriff's Department policy was to conduct annual

8 performance evaluations of deputies.  A deputy's immediate supervisor prepares the evaluation which

9 considers quantity and quality of work, responsiveness, compliance with rules, regulations and

10 procedures, interpersonal, technical and professional skills, attendance, and productivity.  The supervisor

11 reviews the deputy's personnel and bureau files for disciplinary actions or commendations.  The

12 supervisor reviews with the deputy the evaluation and positive and negative traits.  The evaluation may

13 identify a deputy's training needs and is maintained in the deputy's personnel file.

14      Occasionally, due to movement in assignments, shifts, units or bureaus of either the deputy or

15 his/her supervisor, an evaluation may inadvertently not be conducted for a deputy.  The Sheriff's

16 Department policy is that after the absence of an annual evaluation is determined, efforts are made for

17 an immediate evaluation by the deputy's current supervisor.

18      As to Sheriff's Department policies and procedures, Sheriff Pierce declares:

19

20     Sheriff's Department personnel were expected to comply with Fresno Sheriff's Department policies, practices, procedures, and training requirements, and were subject to disciplinary actions[12] if they failed to do so.  At no time has the Fresno Sheriff's Department had a policy, practice, or custom of improperly supervising its personnel.

21

22     At the time of incident that is the subject of this lawsuit, and at all times prior, it was the policy of the Fresno Sheriff's Department that personnel comply with policies and procedures, and general standards in law enforcement.  At no time has the Fresno

23 Sheriff's Department had a policy, practice or custom of allowing its personnel to violate the constitutional rights of citizens under its jurisdiction.  This includes, but is not limited

24 to, use of excessive force, false arrest, denial of medical care, unlawful entry onto private property, or conspiring to commit any of these violations.  All deputy sheriffs received

25

26      [11]    The following attributes of the Sheriff's Department's supervision of personnel is derived generally from

27 the declarations of Sheriff Pierce and Lt. Padilla, who has held several Sheriff's Department positions since is 1991 hiring.

28      [12]    Plaintiffs dispute that Sgt. Broughton's investigation of Mr. Hillbloom's citizen complaint satisfied the Sheriff's Department policy to subject deputies to discipline.

training with respect to these issues and compliance with Fresno Sheriff's Department policy in this regard.

### *Internal Affairs Investigations*

Sheriff Pierce further declares that at the time of Mr. Hillbloom's arrest and during Sheriff Pierce's tenure, the Sheriff's Department policy and practice has been "to conduct thorough investigations into allegations of misconduct on the part of its personnel."[13]

A citizen complaint or Sheriff's Department members internally may initiate an administrative investigation into misconduct allegations. Sheriff's Department personnel are notified in writing if they are subject to an Internal Affairs investigation. If a complaint results in investigation, it is assigned to an Internal Affairs investigator or returned to the bureau of the deputy who is subject to the complaint to conduct the investigation.

The investigator examines whether there has been a violation of Sheriff's Department policies or law, conducts interviews and obtains relevant documents.[14] Generally, the investigator determines if there has been similar complaints against the deputy. The Sheriff's Department practice is to make efforts to send Internal Affairs investigators to a POST-certified course within a reasonable time of assignment to a particular unit.

After a completed investigation, the investigator prepares a summary investigative package which proceeds to the deputy's unit commander, who reviews the investigation and recommends imposition of discipline, additional training or other action. The investigation and recommendation proceeds to the Sheriff's Department Professional Standards Review Board ("PSRB") for independent review. The PSRB consists of five members of the Sheriff's Department executive staff with a rank of captain or above. The PSRB reviews the investigation and recommends whether a policy has been violated and corresponding discipline to be imposed. After PSRB review, the investigation proceeds through a similar process with the Assistant Sheriff and then onto the Sheriff for review and final

---

[13]     Plaintiffs dispute that the adequacy of the investigation into Mr. Hillbloom's citizen complaint in that it was assigned to Sgt. Broughton.

[14]     Again, plaintiffs question the adequacy of Sgt. Broughton's investigation into Mr. Hillbloom's citizen complaint.

17

1    disposition.

2         Sheriff Pierce notes with respect to the events at issue in this action, the above procedures were

3    followed.

4         If discipline is imposed, documentation to that effect is placed in the deputy's personnel file.  If

5    discipline is not imposed, the completed Internal Affairs investigation is maintained in the Internal

6    Affairs Unit office.

7         In his declaration, Sheriff Pierce concludes: "At all times alleged in plaintiffs' complaint, it was

8    the policy of the Fresno Sheriff's Department to take sufficient corrective action to prevent its employees

9    from committing misconduct, including but not limited to, constitutional violations, or any violations

10   of state or federal law."

11                                  ***Critical Incident Reports***

12        Prior to and at the time of Mr. Hillbloom's arrest, the Sheriff's Department maintained a policy

13   and practice that supervisors prepare "Critical Incident Reports" if certain criteria are met during law

14   enforcement activity and including pursuits, forced entries, and use of force resulting in injury to a

15   suspect.  A Critical Incident Report is required despite whether there is a complaint about a deputy.

16        With a triggering event, a deputy's supervisor will conduct an investigation, including interviews

17   and photographs.  The supervisor prepares a report with attached relevant documents and determines

18   compliance with Sheriff's Department policies, law and appropriate techniques and whether training

19   issues were identified.

20        The completed Critical Incident Report is forwarded to the watch, unit or area commander for

21   the involved deputy.  The commander reviews the report and independently determines whether the

22   deputy complied with policies, law and appropriate techniques and whether training issues were

23   identified.  The investigation proceeds to the Sheriff's Department Training Unit commander who

24   independently evaluates the same issues.  After such review, the investigation proceeds to the Bureau

25   commander for the same process and finally to the Assistant Sheriff for independent evaluation.  A log

26   of Critical Incident Reports and the reports are maintained in the Internal Affairs office.

27        Lt. Padilla notes that the above Critical Incident Reports procedures were followed in connection

28

1  with Mr. Hillbloom's arrest.[15]

2  ### *Personnel, Bureau And Background Investigation Files*

3  Employment history of a Sheriff's Department employee is maintained in a personnel file, which

4  includes performance evaluations, disciplinary actions, promotions, and step increases.  A "bureau file"

5  is maintained for individual deputies, is considered a "working file," and follows the deputy to each

6  assigned bureau or unit.  A bureau file includes commendations, notes on discipline, and training

7  records.  A bureau file maintains documents for a deputy's supervisor to review to prepare an annual

8  performance evaluation.  A bureau file further documents a deputy's training needs and complaints that

9  do not merit an Internal Affairs investigation.

10  Documents obtained and generated during background investigation of a deputy applicant are

11  maintained separately and include employment applications and documents obtained during the

12  investigation, such as, references, personal history statements, school records, marriage certificates,

13  recommendation letters, background investigator summaries, and the routing form to determine whether

14  an applicant should be hired.

15  ### *Claims And Litigation*

16  Moreover, government claims and lawsuits against Sheriff's Department personnel are monitored

17  by the Sheriff's Department human resources unit commander.  Information regarding the claims and

18  lawsuits are maintained on a spreadsheet with case names and numbers, incident date, and involved

19  personnel.  In his deposition, Lt. Padilla explained that "there's files in there, for lack of a better way of

20  saying it, there may be an Excel sheet where we list it as we got them just so we knew we had them, but

21  it's not a very organized system, it's not formalized or anything like that."

22  ### **Plaintiffs' Police Procedures Expert**

23  Plaintiffs' police procedures expert Roger Clark ("Mr. Clark"), who retired from the Los Angeles

24  County Sheriff's Department after 27 years of service,[16] takes issue with Deputy Carey's hiring given

25  ————————————

26  [15]    Plaintiffs dispute that Sgt. Broughton's CIR was "adequate or truthful."

27  [16]    Defendants challenge Mr. Clark's qualifications and foundation to offer opinions on hiring and supervision.

28  Given this Court's obligation to view evidence in plaintiffs' favor, this Court will not strike Mr. Clark's declaration but acknowledges validity of defendants' points.

the record that Deputy Carey "was unfit for the duties of a law officer."  In his declaration, Mr. Clark notes:

1.  The County twice rejected his employment applications with "Deputy Carey's record of arrests, law enforcement contacts, and admitted drug use before his hire";

2.  A background investigator in 1999 determined Deputy Carey "was not fit for hire" but that recommendation "was nevertheless overridden";

3.  Deputy Carey "demonstrated assaultive behaviors and anger management problems";

4.  Deputy Carey's " background gave the Department knowledge that he was a person who could not be trusted to act properly without supervision"; and

5.  The Sheriff's Department "terminated him for assaultive conduct on his own stepson" but "he was reinstated only because the Department failed to offer live testimony at his Civil Service hearing."

Mr. Clark further faults the Sheriff's Department's failure to track Deputy Carey's "conduct in any effective way so as to permit adequate supervision."  Mr. Clark opines that "the Sheriff's Department's response to the Hillbloom incident is just one example of a non-existent and/or inadequate personnel tracking system."

### Plaintiffs' Claims

Plaintiffs proceed on their operative First Amended Complaint for Damages ("FAC") to allege against defendants claims under 42 U.S.C. § 1983 ("section 1983") for illegal warrantless arrest and California law claims of negligent and intentional infliction of emotional distress, false arrest/imprisonment, and negligent employment, training and supervision, which will be addressed in greater detail below.  The FAC seeks to recover punitive damages and for plaintiffs' physical injury and emotional distress.

### DISCUSSION

### Summary Judgment/Adjudication Standards

Defendants seek summary adjudication to limit trial to the section 1983 and state law false arrest and excessive force claims against Deputy Carey only.

F.R.Civ.P. 56(b) permits a "party against whom relief is sought" to seek "summary judgment on

1  all or part of the claim."  "A district court may dispose of a particular claim or defense by summary

2  judgment when one of the parties is entitled to judgment as a matter of law on that claim or defense."

3  *Beal Bank, SSB v. Pittorino*, 177 F.3d 65, 68 (1st Cir. 1999).

4  Summary judgment is appropriate when there exists no genuine issue as to any material fact and

5  the moving party is entitled to judgment as a matter of law.  F.R.Civ.P. 56(c)(2); *Matsushita Elec. Indus.*

6  *v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986); *T.W. Elec. Serv., Inc. v. Pacific*

7  *Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  The purpose of summary judgment is to

8  "pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial."

9  *Matsushita Elec.,* 475 U.S. at 586, n. 11, 106 S.Ct. 1348; *International Union of Bricklayers v. Martin*

10  *Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985).

11  On summary judgment, a court must decide whether there is a "genuine issue as to any material

12  fact," not weigh the evidence or determine the truth of contested matters.  F.R.Civ.P. 56(c)(2); *Covey*

13  *v. Hollydale Mobilehome Estates*, 116 F.3d 830, 834 (9th Cir. 1997); *see Adickes v. S.H. Kress & Co.*,

14  398 U.S. 144, 157, 90 S.Ct. 1598 (1970); *Poller v. Columbia Broadcast System*, 368 U.S. 464, 467, 82

15  S.Ct. 486 (1962); *Loehr v. Ventura County Community College Dist.*, 743 F.2d 1310, 1313 (9th Cir.

16  1984).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate

17  inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for

18  summary judgment or for a directed verdict."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106

19  S.Ct. 2505 (1986)

20  The evidence of the party opposing summary judgment is to be believed and all reasonable

21  inferences that may be drawn from the facts before the court must be drawn in favor of the opposing

22  party.  *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348.  The

23  inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or

24  whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-

25  252, 106 S.Ct. 2505.

26  To carry its burden of production on summary judgment, a moving party "must either produce

27  evidence negating an essential element of the nonmoving party's claim or defense or show that the

28  nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of

persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990). "[T]o carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact." *Nissan Fire*, 210 F.3d at 1102; *see High Tech Gays*, 895 F.2d at 574. "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

"If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire*, 210 F.3d at 1102-1103; *see Adickes*, 398 U.S. at 160, 90 S.Ct. 1598. "If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Nissan Fire*, 210 F.3d at 1103; *see High Tech Gays*, 895 F.2d at 574. "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Nissan Fire*, 210 F.3d at 1103; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986) ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make the showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.")

"But if the nonmoving party produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion." *Nissan Fire*, 210 F.3d at 1103; *see Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (quoting *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288-289, 88 S.Ct. 1575, 1592 (1968)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

Under F.R.Civ.P. 56(d)(2), a summary judgment/adjudication motion, interlocutory in character, may be rendered on the issue of liability alone. "In cases that involve . . . multiple causes of action, summary judgment may be proper as to some causes of action but not as to others, or as to some issues

but not as to others, or as to some parties, but not as to others." *Barker v. Norman*, 651 F.2d 1107, 1123 (5th Cir. 1981); *see also Robi v. Five Platters, Inc.*, 918 F.2d 1439 (9th Cir. 1990); *Cheng v. Commissioner Internal Revenue Service*, 878 F.2d 306, 309 (9th Cir. 1989).  A court "may grant summary adjudication as to specific issues if it will narrow the issues for trial." *First Nat'l Ins. Co. v. F.D.I.C.*, 977 F.Supp. 1051, 1055 (S.D. Cal. 1977).

As discussed below, defendants have negated essential elements of some of plaintiffs' claims or have shown that plaintiffs lack sufficient evidence to support essential elements of some of plaintiffs' claims.

## **Unlawful Entry**

The FAC's (first) section 1983 "Illegal Warrantless Arrest" claim ("section 1983 claim") alleges that defendants subjected Mr. Hillbloom "to excessive and unreasonable force, to unjustifiable denial of liberty, and to deprivation of necessary medical care" and conspiracy "to cover up defendants' misconduct by causing the commencement of a fraudulent criminal proceeding" by preparation of false "crime and arrest reports in which defendants attempted to conceal their misconduct."  The section 1983 claim further alleges that the "County had hiring, training, discipline and reassignment policies that amounted to deliberate indifference to the rights of the persons with whom its Sheriff's deputies are likely to come into contact, expressed in its deliberate policies of hiring officers known to be unfit for law enforcement work and failing adequately to train, discipline or reassign such officers in order to prevent injury to members of the public."

### *Section 1983 Requirements*

"Section 1983 imposes two essential proof requirements upon a claimant:  (1) that a person acting under color of state law committed the conduct at issue, and (2) that the conduct deprived the claimant of some right, privilege, or immunity protected by the Constitution or laws of the United States." *Leer v. Murphy*, 844 F.2d 628, 632-633 (9th Cir. 1988).

"Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271, 114 S.Ct. 807, 811 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144, n. 3, 99 S.Ct. 2689, 2694, n. 3 (1979)). Section 1983 and other federal civil rights statutes address liability "in favor of persons who are deprived

of 'rights, privileges, or immunities secured' to them by the Constitution." *Carey v. Piphus*, 435 U.S. 247, 253, 98 S.Ct. 1042 (1978) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 417, 96 S.Ct. 984, 996 (1976)).  "The first inquiry in any § 1983 suit, therefore, is whether the plaintiff has been deprived of a right 'secured by the Constitution and laws.'" *Baker*, 443 U.S. at 140, 99 S.Ct. 2689.   Stated differently, the first step in a section 1983 claim is to identify the specific constitutional right allegedly infringed.  *Albright*, 510 U.S. at 271, 114 S.Ct. at 811.  "Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law." *Baker*, 443 U.S. at 146, 99 S.Ct. 2689.

### *Warrantless Entry*

Defendants note that the section 1983 claim does not allege unlawful entry although the FAC's "Common Allegations" reference "the lack of consent for Deputy Carey's entry."  Defendants seek summary adjudication "[o]ut of an abundance of caution, to the extent that plaintiffs are alleging unlawful entry, or linking the Fourth Amendment excessive force and false arrest causes of action to an unlawful entry claim."

Plaintiffs do not acknowledge whether they pursue an unlawful entry claim.  Their opposition points and authorities reference "Unreasonable Government Intrusion" and claim as "undisputed" that Deputy Carey lacked probable cause or exigent circumstances to entitle him to enter Mr. and Mrs. Hillbloom's home.  As such, this Court presumes that plaintiffs pursue an unlawful entry claim.

"It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371 (1980).  However, the Fourth Amendment's warrantless entry prohibition does not apply "to situations in which voluntary consent has been obtained, either from the individual whose property is searched . . ., or from a third party who possesses common authority over the premises . . . ." *Illinois v. Rodriguez*, 497 U.S. 177, 181, 110 S.Ct. 2793 (1990) (citations omitted).  No constitutional violation arises "when officers enter without a warrant because they reasonably (though erroneously) believe that the person who has consented to their entry is a resident of the premises." *Rodriguez*, 497 U.S. at 186, 110 S.Ct. 2793.

The U.S. Supreme Court has explained:

. . . what we hold today does not suggest that law enforcement officers may always accept a person's invitation to enter premises. Even when the invitation is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry. As with other factual determinations bearing upon search and seizure, determination of consent to enter must "be judged against an objective standard: would the facts available to the officer at the moment . . . 'warrant a man of reasonable caution in the belief'" that the consenting party had authority over the premises? *Terry v. Ohio*, 392 U.S. 1, 21-22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). If not, then warrantless entry without further inquiry is unlawful unless authority actually exists.

*Rodriguez*, 497 U.S. at 188-189, 110 S.Ct. 2792; *see People v. Ledesma*, 39 Cal.4th 641, 704, 140 P.3d 657 (2006) ("the police may assume, without further inquiry, that a person who answers the door in response to their knock has the authority to let them enter").

Defendants argue that Deputy Carey's "entry was reasonable" in that Deputy Carey came to Mr. and Mrs. Hillbloom's home at the request of Ms. Leon, who answered the door and allowed him inside and whose son was in the home. Defendants note Deputy Carey's lack of "reason to question her authority" and the absence of indication of "involuntary" consent. Defendants point to Ms. Leon's permission for Deputy Carey to proceed in the home to the room where Michael was located.

Turning to the scope of Ms. Leon's authority, defendants note Deputy Carey's knowledge that Ms. Leon was Mr. and Mrs. Hillbloom's daughter and was inside their home with their "express consent." Defendants contend that Ms. Leon shared "mutual use and joint access" with Mr. and Mrs. Hillbloom.

Defendants further claim that Deputy Carey "did not act unreasonably when Mr. Hillbloom told him to get out" in that "in responding to a call of an out-of-control juvenile, Deputy Carey had been unable to determine who was who and the roles each played" and was concerned that "the grandparents were not helping matters, thereby implicating a possible court order." Defendants further point to Deputy Carey's concern about an unstable situation given Mr. Hillbloom's reaction to Deputy Carey's presence and inability to determine Mr. Hillbloom's authority to order Deputy Carey out of the home since Ms. Leon had authorized Deputy Carey's entry into and passing though the home. Defendants conclude that under the circumstances, Deputy Carey reasonably could not leave the home given a potential risk of the safety to Michael, Ms. Leon and Deputy Carey and would have been "derelict" had he left the home.

25

Plaintiffs respond that the record challenges whether Ms. Leon "had authority over the premises so that she could consent to his warrantless entry."  Plaintiffs argue that given the ambiguity over Ms. Leon's authority, "Deputy Carey had an obligation to conduct further factual inquiry before relying on her consent."  Plaintiffs question the reasonableness of Deputy Carey remaining in the home after Mr. Hillbloom challenged Deputy Carey's presence in the home and Ms. Leon's authority to allow him in the home, especially given facts to question whether Ms. Leon lived in the home.  Plaintiffs further challenge Deputy Carey's probable cause to enter or remain in the home in the absence of information to suggest danger to Michael, violence or Mr. Hillbloom's criminal activity.  Plaintiffs characterize Deputy Carey's entry into the home as "trespass by law enforcement."

The record reveals factual questions as to Deputy Carey's legality to enter and remain in Mr. and Mrs. Hillbloom's home.  Defendants acknowledge "there is a factual dispute in terms of the various events and their exact sequence."  When Deputy Carey arrived at the home, he had dispatch information that Michael was at his grandmother's home and refused to leave for his home, that Ms. Leon had full custody of Michael, and that there had been an ongoing problem with Michael attempting to stay at the grandparent's home.  Deputy Carey had knowledge and access to facts that Michael was not in his own home and that his mother, Ms. Leon, attempted to get Michael to leave the home with her.  The undisputable conclusion from the facts is that Deputy Carey knew that the home was not Michael or Ms. Leon's.  Questions exist as to reasonableness of Deputy Carey's entry let alone his proceeding through the home.

The reasonableness issue worsens for defendants based on viewing in plaintiffs' favor the facts after Deputy Carey's entry.  There is no dispute that Mr. Hillbloom challenged Deputy Carey's remaining in the home.  The evidence in plaintiffs' favor reveals the Mr. Hillbloom further challenged Ms. Leon's authority to allow Deputy Carey to enter the home.  Deputy Carey's claim of exigency or an unstable situation is unavailing in the absence of facts of criminal activity or confrontation or violence among the plaintiffs and/or Ms. Leon.  In fact, Deputy Carey found Michael sitting "quietly" at a table.  There is no evidence of distress until Deputy Carey appears in the home's den area.  The evidence reveals that Deputy Carey's reasonable course of action was to exit the home to discuss the matter with Mr. Hillbloom and Michael outside.  Deputy Carey chose not to.  In sum, based on the record, Deputy

1   Carey unreasonably accepted Ms. Leon's invitation to enter the home and unreasonably proceeded

2   through it.

3       Turning to Sgt. Broughton, defendants contend he is not subject to an unlawful entry claim in

4   the absence of evidence that he entered the home.  Plaintiffs do not contend that Sgt. Broughton is

5   subject to an unlawful entry claim to warrant summary adjudication in his favor on such claim.

6                                   ***Qualified Immunity***

7       Defendants further contend that qualified immunity defeats an unlawful entry claim against

8   Deputy Carey.

9                               <u>Purpose And Elements</u>

10      Qualified immunity protects section 1983 defendants "from liability for civil damages insofar

11  as their conduct does not violate clearly established statutory or constitutional rights of which a

12  reasonable person would have known." *Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d 936, 943 (9th Cir.

13  2004), *overruled on other grounds, Action Apt. Assoc., Inc. v. Santa Monica Rent Control Bd.*, 509 F.3d

14  1020 (9th Cir. 2007).  The "heart of qualified immunity is that it spares the defendant from having to go

15  forward with an inquiry into the merits of the case.  Instead, the threshold inquiry is whether, assuming

16  that what the plaintiff asserts the facts to be is true, any allegedly violated right was clearly established."

17  *Kelley v. Borg*, 60 F.3d 664, 666 (9th Cir. 1995).

18      The issue of qualified immunity is "a pure question of law." *Elder v. Holloway*, 510 U.S. 510,

19  514, 114 S.Ct. 1019 (1994); *Romero v. Kitsap County*, 931 F.2d 624, 627-628 (9th Cir. 1991).  To

20  analyze qualified immunity, a court determines: (1) what right has been violated; (2) whether that right

21  was so "clearly established" at the time of the incident that a reasonable officer would have been aware

22  of its constitutionality; and (3) whether a reasonable public officer could have believed that the alleged

23  conduct was lawful. *Jensen v. City of Oxnard*, 145 F.3d 1078, 1085 (9th Cir. 1998), *cert. denied*, 525

24  U.S. 1016, 119 S.Ct. 540 (1988).  In *Skoog v. County of Clackamas*, 469 F.3d 1221, 1229 (9th Cir. 2006),

25  the Ninth Circuit Court of Appeals explained in greater detail:

26          Determining whether an official is entitled to summary judgment based on the
        affirmative defense of qualified immunity requires applying a three-part test.  First, the
27      court must ask whether "[t]aken in the light most favorable to the party asserting the
        injury, [ ] the facts alleged show the officer's conduct violated a constitutional right?"
28      If the answer is no, the officer is entitled to qualified immunity. If the answer is yes, the

                                        27

court must proceed to the next question: whether the right was clearly established at the time the officer acted. That is, "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." If the answer is no, the officer is entitled to qualified immunity. If the answer is yes, the court must answer the final question: whether the officer could have believed, "reasonably but mistakenly ... that his or her conduct did not violate a clearly established constitutional right." If the answer is yes, the officer is entitled to qualified immunity. If the answer is no, he is not. (Footnotes omitted.)

"The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, __ U.S. __, 129 S.Ct. 808, 818 (2009). In discussing *Pearson*, the Ninth Circuit Court of Appeals recently explained that "lower courts are no longer required to consider whether a constitutional violation occurred before considering whether the right in question was 'clearly established.'" *Moss v. U.S. Secret Service*, 572 F.3d 962, 968, n. 5 (9th Cir. 2009).

Clearly Established Right

The "contours" of the allegedly violated right "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. . . . [I]n the light of preexisting law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 3039 (1987). "The question is what the officer reasonably understood his powers and responsibilities to be, when he acted under clearly established standards." *Saucier v. Katz*, 533 U.S. 194, 208, 121 S.Ct. 2151 (2001).

"To determine that the law was clearly established, we need not look to a case with identical or even 'materially similar' facts." *Serrano v. Francis*, 345 F.3d 1071, 1077 (9th Cir. 2003), *cert. denied*, 543 U.S. 825, 125 S.Ct. 43 (2004). "Rather, the 'standard is one of fair warning: where the contours of the right have been defined with sufficient specificity that a state official had fair warning that [his] conduct deprived a victim of his rights, [he] is not entitled to qualified immunity.'" *Serrano*, 345 F.3d at 1077 (quoting *Haugen v. Brosseau*, 339 F.3d 857, 873 (9th Cir. 2003)). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508 (2002).

Initially, defendants reincorporate their arguments that Deputy Carey and Sgt. Broughton violated no constitutional rights. As addressed above, the law clearly establishes a prohibition against warrantless

28

entry and remaining in a home.  Despite Deputy Carey's explanations, the evidence suggests that Deputy Carey exceeded permissible entry into and remaining in Mr. and Mrs. Hillbloom's home given Ms. Leon's questionable authority to invite him into the home.  Plaintiffs more that satisfy the clearly established right prong as to Deputy Carey.

Reasonable Belief

"If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense."  *Saucier*, 533 U.S. at 205, 121 S.Ct. 2151.  "The question is what the officer reasonably understood his powers and responsibilities to be, when he acted under clearly established standards."  *Saucier*, 533 U.S. at 208, 121 S.Ct. 2151.  "Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted."  *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S.Ct. 596, 599 (2004).  "Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause or exigent circumstances, for example, and in those situations courts will not hold that they have violated the Constitution."  *Saucier*, 533 U.S. 194, 121 S.Ct. at 2158.  Peace officers in "tense situations" are afforded "broad discretion" and "immunity even when officers make mistakes."  *See Jeffers v. Gomez*, 267 F.3d 895, 909 (9th Cir. 2001).

"If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate."  *Saucier*, 533 U.S. at 202, 121 S.Ct. at 2156-2157.  However, determination of qualified immunity on summary judgment is improper if there are disputes "as to the facts and circumstances."  *See Acosta v. City and County of San Francisco*, 83 F.3d 1143, 1147, n. 10 (9th Cir.), *cert. denied*, 519 U.S. 1009, 117 S.Ct. 514 (1996).  When "there is a material dispute as to the facts regarding what the officer or the plaintiff actually did, the case must proceed to trial."  *Lalonde v. County of Riverside*, 204 F.3d 947, 953 (9th Cir. 2000).

A defendant "carries the burden of proving that his 'conduct was reasonable under the applicable standards even though it might have violated [plaintiff's] constitutional rights.'" *Houghton v. South*, 965 F.2d 1532, 1534 (1992) (quoting *Benigni v. City of Hemet*, 879 F.2d 473, 480 (9th Cir.1988)).

Defendants argue that "Deputy Carey reasonably believed that he was provided valid consent to enter plaintiffs' residence to further investigate what was taking place with respect to Michael's

refusal to return home with his mother." Defendants contend that Deputy Carey's response to Mr. Hillbloom's directive to leave was reasonable under the "facts" which Deputy Carey possessed. Defendants characterize the law regarding consent and apparent consent as "intricate and complex" to unreasonably expect "a peace officer to make a totally accurate, on-the-spot, legal determination on such a complex issue."

Deputy Carey is not entitled to qualified immunity as to unlawful entry in that as discussed above, the evidence no less than suggests that Deputy Carey unlawfully entered and remained in Mr. and Mrs. Hillbloom's home when the law put Deputy Carey on notice that doing so was clearly unlawful. The law put Deputy Carey on notice that he should have better assessed the situation before crossing the threshold and proceeding through the house. There is no evidence that Deputy Carey considered but rejected reasonable alternatives, including asking to speak to one of the grandparents, asking Ms. Leon to bring Michael to the door, or asking Ms. Leon to inform the occupants that he awaited them at the front door. The evidence reveals that Deputy Carey lacked necessary information to support a claim of reasonable mistake as to the situation. Nothing in the record supports that Deputy Carey reasonably understood he could enter, proceed through and remain in the home under the circumstances he encountered, especially given the absence of evidence of an emergency.

## Denial Of Medical Care

The section 1983 claim alleges that Mr. Hillbloom was deprived of "necessary medical care."

"Claims of failure to provide care for serious medical needs, when brought by a detainee . . . who has been neither charged nor convicted of a crime, are analyzed under the substantive due process clause of the Fourteenth Amendment." *Lolli v. County of Orange*, 351 F.3d 410, 418-419 (9th Cir. 2003); *see Gibson v. County of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002), *cert. denied*, 537 U.S. 1106, 123 S.Ct. 872 (2003). "With regard to medical needs, the due process clause imposes, at a minimum, the same duty the Eighth Amendment imposes: 'persons in custody ha[ve] the established right to not have officials remain deliberately indifferent to their serious medical needs.'" *Gibson*, 290 F.3d at 1187 (quoting *Carnell v. Grimm*, 74 F.3d 977, 979 (9th Cir. 1996)). "Under the Eighth Amendment's standard of deliberate indifference, a person is liable for denying a prisoner needed medical care only if the person 'knows of and disregards an excessive risk to inmate health and safety.'" *Gibson*, 290 F.3d at 1187

1   (quoting *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970 (1994)).

2        The two-part test for deliberate indifference requires the plaintiff to show (1) "'a serious medical

3   need' by demonstrating that 'failure to treat a prisoner's condition could result in further significant

4   injury or the unnecessary and wanton infliction of pain,'" and (2) "the defendant's response to the need

5   was deliberately indifferent." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *McGuckin v.*

6   *Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds, WMX Techs., Inc. v. Miller*,

7   104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal quotations omitted)).

8        Deliberate indifference is shown by "a purposeful act or failure to respond to a [detainee's] pain

9   or possible medical need, and harm caused by the indifference." *Jett*, 439 F.3d at 1096 (citing *McGuckin*,

10  974 F.2d at 1060). Deliberate indifference may be manifested when officials "deny, delay or

11  intentionally interfere with medical treatment." *Jett*, 439 F.3d at 1096 (citing *McGuckin* 974 F.2d at 1060

12  (internal quotations omitted)).

13       "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th

14  Cir. 2004). Indifference to "medical needs must be substantial.  Mere 'indifference,' 'negligence,' or

15  'medical malpractice' will not support this cause of action." *Broughton v. Cutter Laboratories*, 622 F.2d

16  458, 460 (9th Cir. 1980).  Under the deliberate indifference standard, an "official must not only 'be

17  aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,'

18  but that person 'must also draw the inference.'" *Toguchi*, 391 F.3d at 1057 (quoting *Farmer v. Brennan*,

19  511 U.S. 825, 837, 114 S.Ct. 1970 (1994)).  "But if a person is aware of a substantial risk of serious

20  harm, a person may be liable for neglecting a [detainee's] serious medical needs on the basis of either

21  his action or his inaction." *Gibson*, 290 F.3d at 1188 (alteration in original).  "A defendant must

22  purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for deliberate

23  indifference to be established."  *McGuckin*, 974 F.2d at 1060 (9th Cir. 1992).

24                                  ***Serious Medical Need***

25       Defendants argue an absence of evidence that Mr. Hillbloom suffered "significant harm" or "any

26  medical harm."  Defendants note that Mr. Hillbloom merely claims that his insulin pump was pulled out

27  during his arrest and that Deputy Carey ignored Mr. Hillbloom's request to re-insert it.  Defendants point

28  to Sgt. Broughton's arrival approximately five minutes after Mr. Hillbloom's arrest and Mrs.

31

1   Hillbloom's informing Sgt. Broughton about the insulin pump.  Defendants further point to Michael's

2   retrieval of necessary supplies and Mr. Hillbloom's exit of the patrol car to reinsert the pump.

3   Defendants note the absence of Mr. Hillbloom's request for or attempt to seek medical attention.

4       Plaintiffs respond that Deputy Carey and Sgt. Broughton "knew, early on in Mr. Hillbloom's

5   detention, that he was at serious risk of harm because his insulin pump" detached.  Plaintiffs offer the

6   declaration of Peter Butler, M.D. ("Dr. Butler"), Mr. Hillbloom's physician "responsible for the care of

7   his diabetic condition," that the jump in Mr. Hillbloom's glucose level during his detention was

8   "dangerous because it can lead to serious illness."  Dr. Butler notes that "if the insulin deprivation had

9   gone on for another two to three hours, it could have resulted in coma and/or death."

10      Defendants object to Dr. Butler's belated declaration in that plaintiffs did not disclose Dr. Butler

11  as an expert.  Defendants' objection is well taken, and Dr. Butler's declaration it not subject to

12  consideration in the absence of his disclosure as an expert.[17]  *See* F.R.Civ.P. 37(c)(1).

13      Without Dr. Butler's declaration, plaintiffs fail to raise a factual issue whether Mr. Hillbloom

14  had a serious medical need during his detention.  Although diabetes may constitute a serious medical

15  need, there is no evidence that it rose to such level during the limited time that Mr. Hillbloom lacked his

16  insulin pump.  In the absence of other evidence of a serious medical need, defendants negate an essential

17  element of deliberate indifference for a section 1983 claim for denial of medical care.

### *Deliberate Indifference*

19      Defendants contend that "there were no objective facts that would lead a reasonable officer to

20  suspect that Mr. Hillbloom required immediate medical attention that he did not already have access to"

21  to entitle Deputy Carey and Sgt. Broughton to summary adjudication on Mr. Hillbloom's denial of

22  medical care claim.[18]

23      Plaintiffs appear to claim that Deputy Carey and Sgt. Broughton were deliberately indifferent

24  based on delay to permit Mr. Hillbloom to insert a new insulin pump and requiring him to perform the

---

26      [17]    In communications with Court staff, plaintiffs' counsel acknowledged this Court's potential to disregard
Dr. Bulter's declaration.

27

28      [18]    Without meaningful explanation, defendants also claim Deputy Carey and Sgt. Broughton are no less than
entitled to qualified immunity.

1   procedure outside rather than in his well lit home.

2        Despite plaintiffs' emotional pleas, the record raises no factual issues that Deputy Carey and Sgt.

3   Broughton's purposeful acts or failures to respond caused Mr. Hillbloom significant harm.  The record

4   suggests that for 10-15 minutes, Mr. Hillbloom remained without his insulin pump during which time

5   his insulin glucose level rose but was managed upon reinsertion of the insulin pump and which Sgt.

6   Broughton and Deputy Carey allowed.  Although Deputy Carey's alleged "I don't care" comment is

7   callous, it does not substantiate deliberate indifference, even considering the other matters which

8   plaintiffs raise.  Despite Mr. Hillbloom's claim that he should have been taken to an emergency room,

9   there is no evidence that he made such request or sought medical attention upon his release from

10  custody.  The record reveals that Mr. Hillbloom was inconvenienced and perhaps justifiably agitated but

11  does not reveal factual questions as to deliberate indifference to warrant summary adjudication for

12  defendants as to section 1983 liability for denial of medical care.

13                                  **Conspiracy**

14       The section 1983 claim alleges that defendants conspired to cover up their misconduct "by

15  causing the commencement of a fraudulent criminal proceeding" through preparation of false reports.

16       A section 1983 conspiracy claim means "a conspiracy to violate a right protected by § 1983; in

17  other words, a conspiracy to deprive a plaintiff of a constitutional or federally protected right under color

18  of state law." *Dixon v. City of Lawton, Okl.*, 898 F.2d 1443, 1449, n. 6 (10th Cir. 1990).  A section 1983

19  civil rights conspiracy is a combination of two or more persons acting in concert to commit an unlawful

20  act, or to commit a lawful act by unlawful means, the principal element of which is an agreement

21  between the parties to inflict a wrong against or injury upon another, and an overt act that results in

22  damages.  *Earle v. Benoit*, 850 F.2d 836, 844 (1st Cir. 1988).

23       To establish liability for conspiracy, a plaintiff must demonstrate existence of "'an agreement

24  or 'meeting of the minds' to violate constitutional rights.'" *United Steelworkers of America v. Phelps

25  Dodge Corp.*, 865 F.2d 1539, 1540-1541 (9th Cir. 1989) (en banc) (quoting *Fonda v. Gray*, 707 F.2d 435,

26  438 (9th Cir. 1981)).  The defendants must have, "by some concerted action, intend[ed] to accomplish

27  some unlawful objective for the purpose of harming another which results in damage.'" *Gilbrook v. City

28  of Westminister*, 177 F.3d 839, 856 (9th Cir. 1999) (quoting *Vieux v. East Bay Reg'l Park Dist.*, 906 F.2d

                                    33

1330, 1343 (9th Cir.), *cert. denied*, 498 U.S. 967, 111 S.Ct. 430 (1990)).  Whether defendants were involved in an unlawful conspiracy is generally a factual issue to be resolved by the jury when there is a possibility that the jury can infer from the circumstances that the alleged conspirators had a meeting of the minds and thus reached an understanding to achieve conspiracy objectives.  *Mendocino Environmental Center v. Mendocino County*, 192 F.3d 1283, 1301 (9th Cir. 1999).  A plaintiff must produce "'concrete evidence' of an agreement or 'meeting of the minds'" between defendant conspirators to violate plaintiff's rights.  *Radcliffe v. Rainbow Const. Co.*, 254 F.3d 772, 782 (9th Cir.), *cert. denied*, 534 U.S. 1020, 122 S.Ct. 545 (2001).  "A conspiracy to deprive a plaintiff of a civil rights action by lying or concealing evidence might constitute such an actionable deprivation." *Ting v. U.S.,* 927 F.2d 1504, 1512 (9th Cir. 1991).

Defendants point to the absence of evidence "to show any agreement between Deputy Carey and Sergeant Broughton."  Defendants note that plaintiffs' "evidence is limited to their different version of events."  Plaintiffs respond that Deputy Carey and Sgt. Broughton "fabricated, omitted and lied in their reports to superiors in strikingly similar ways" so that "a reasonable jury could conclude that there was an agreement to conceal evidence."

The gist of plaintiffs' section 1983 conspiracy claim is that they disagree with Deputy Carey and Sgt. Broughton's reporting of the events at issue.  Although plaintiffs go to great lengths to point our their disagreements with Sgt. Broughton's CIR and August 7 memo, they point to little of Deputy Carey's reporting and appear to take issue with the citation Deputy Carey prepared for Mr. Hillbloom.  Plaintiffs' disagreements with Sgt. Broughton's reporting and the citation fail to substantiate or raise factual issues as to a section 1983 conspiracy.  Plaintiffs fail to articulate a protected right subject to a conspiracy and overt acts to support an agreement to conspire.  No factual issue arises in the absence of circumstances of a meeting of minds and understanding to achieve conspiracy objectives.  In the absence of concrete evidence of an agreement or meeting of minds, defendants are entitled to summary adjudication on a claim of section 1983 conspiracy.

### Absence Of Sgt. Broughton's Excessive Force

The section 1983 claim alleges that defendants subjected Mr. Hillbloom "to excessive and unreasonable force."

Defendants seek summary adjudication that Sgt. Broughton is not subject to an excessive force claim in the absence of his direct involvement with Mr. Hillbloom's arrest.

"Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation." *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996), *cert. denied*, 520 U.S. 1230, 117 S.Ct. 1822 (1997); *see Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("Liability under section 1983 arises only upon a showing of personal participation by the defendant.")  "The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused the constitutional deprivation." *Leer*, 844 F.2d at 633.  Section 1983 requires that there be an actual connection or link between the defendant's actions and the deprivation allegedly suffered. *See Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018 (1978); *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598 (1976).

A plaintiff cannot hold an officer liable "because of his membership in a group without a showing of individual participation in the unlawful conduct." *Jones v. Williams*, 297 F.3d 930, 935 (9th Cir. 2002) (citing *Chuman v. Wright*, 76 F.3d 292, 294 (9th Cir. 1996)).  A plaintiff must "establish the 'integral participation' of the officers in the alleged constitutional violation." *Jones*, 297 F.3d at 935. "'[I]ntegral participation' does not require that each officer's actions themselves rise to the level of a constitutional violation." *Boyd v. Benton County*, 374 F.3d 773, 780 (9th Cir. 2004).  Integral participation requires "some fundamental involvement in the conduct that allegedly caused the violation." *Blankenhorn v. City of Orange*, 485 F.3d 463, 481, n. 12 (9th Cir. 2007).  "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).

In addition, Congress did not intend to "impose liability vicariously on [employers or supervisors] solely on the basis of the existence of an employer-employee relationship with a tortfeasor." *Monell*, 436 U.S. at 692, 98 S.Ct. at 2036.  Generally, supervisory personnel are not liable under section 1983 for actions of their employees under a respondeat superior theory, and thus, when a named

defendant holds a supervisory position, the causal link between him and the claimed constitutional violation must be specifically alleged and proved. *See Jeffers v. Gomez*, 267 F.3d 895, 915 (9th Cir. 2001); *Fayle v. Stapley*, 607 F.2d 858, 862 (9th Cir. 1979); *Mosher v. Saalfeld*, 589 F.2d 438, 441 (9th Cir. 1978), *cert. denied*, 442 U.S. 941, 99 S.Ct. 2883 (1979).

To establish a prima facie case of supervisor liability, a plaintiff must show facts to indicate that the supervisor defendant either: (1) personally participated in the alleged deprivation of constitutional rights; (2) knew of the violations and failed to act to prevent them; or (3) promulgated or implemented a policy "so deficient that the policy itself 'is a repudiation of constitutional rights' and is 'the moving force of the constitutional violation.'" *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989); *Taylor*, 880 F.2d at 1045. A supervising official is liable in his individual capacity if he "set[ ] in motion a series of acts by others, or knowingly refused to terminate a series of acts by others, which he kn[e]w or reasonably should [have] know[n], would cause others to inflict the constitutional injury." *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991) (ratification, poor investigation, or failure to terminate series of events may make supervisor liable).[19]

Defendants argue that there is no evidence that Sgt. Broughton:

1.    "[W]as involved in the use of force against Mr. Hillbloom, or his arrest"; or

2.    "[S]et in motion a series of acts by Deputy Carey that he knew would cause him to inflict any alleged Fourth Amendment violations."

Deputy Carey, not Sgt. Broughton, is the target of Mr. Hillbloom's excessive force claim. Plaintiffs offer no meaningful support for an excessive force claim against Sgt. Broughton. Mr. Hillbloom's chief displeasure with Sgt. Broughton is that he denied Mr. Hillbloom's request to insert his insulin pump in his home rather than in patrol car lights. There is no evidence of Sgt. Broughton's direct application of force to Mr. Hillbloom or that Sgt. Broughton set in motion or knowingly refused to terminate Deputy Carey's acts resulting in alleged excessive force. Sgt. Broughton is not subject to a section 1983 excessive force claim.

---

[19]    The Ninth Circuit offered alternative elements to impose section 1983 liability on a supervisor: "'(1) his or her personal involvement in the constitutional deprivation, *or* (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Jeffers*, 267 F.3d at 915 (quoting *Redman v. County of San Diego*, 942 F.2d 1435, 1446 (9th Cir. 1991)).

### Negligent And Intentional Infliction Of Emotional Distress

The FAC alleges (third) negligent infliction of emotional distress ("NIED") and (fourth) intentional infliction of emotional distress ("IIED") claims against Deputy Carey and Sgt. Broughton by which plaintiffs seek recovery for mental suffering.

The elements of an IIED claim are: (1) defendant's outrageous conduct; (2) defendant's intention to cause, or reckless disregard of the probability of causing, emotional distress; (3) plaintiff's suffering severe or extreme emotional distress; and (4) an actual and proximate causal link between the tortious (outrageous) conduct and the emotional distress. *Nally v. Grace Community Church of the Valley*, 47 Cal.3d 278, 300, 253 Cal.Rptr. 97, 110 (1988), *cert. denied*, 490 U.S. 1007, 109 S.Ct. 1644 (1989); *Cole v. Fair Oaks Fire Protection Dist.*, 43 Cal.3d 148, 155, n. 7, 233 Cal.Rptr. 308 (1987).[20] The "[c]onduct to be outrageous must be so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Davidson v. City of Westminister*, 32 Cal.3d 197, 209, 185 Cal.Rptr. 252 (1982) (quoting *Cervantez v. J.C. Penney Co.*, 24 Cal.3d 579, 593, 156 Cal.Rptr.198 (1979)). Conduct is extreme and outrageous when it is of a nature which is especially calculated to cause, and does cause, mental distress. Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. *Fisher v. San Pedro Peninsula Hosp.*, 214 Cal.App.3d 590, 617, 262 Cal.Rptr. 842, 857 (1989).

To support an IIED claim, the conduct must be more than "intentional and outrageous. It must be conduct directed at the plaintiff, or occur in the presence of a plaintiff of whom the defendant is aware." *Christensen v. Superior Court*, 54 Cal.3d 868, 903, 2 Cal.Rptr.2d 79 (1991). The California Supreme Court has further explained:

> "The law limits claims of intentional infliction of emotional distress to egregious conduct toward plaintiff proximately caused by defendant." . . . The only exception to this rule is that recognized when the defendant is aware, but acts with reckless disregard, of the plaintiff and the probability that his or her conduct will cause severe emotional distress to that plaintiff. . . . Where reckless disregard of the plaintiff's interests is the theory of recovery, the presence of the plaintiff at the time the outrageous conduct occurs is

---

[20]     Other California courts have identified the elements as "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff suffered severe or extreme emotional distress; and (3) the plaintiff's injuries were actually and proximately caused by the defendant's outrageous conduct." *Cochran v. Cochran*, 65 Cal.App.4th 488, 494, 76 Cal.Rptr.2d 540 (1998) (citing *KOVR-TV, Inc. v. Superior Court,* 31 Cal.App.4th 1023, 1028, 37 Cal.Rptr.2d 431 (1995)).

1    recognized as the element establishing a higher degree of culpability which, in turn,
2    justifies recovery of greater damages by a broader group of plaintiffs than allowed on a
     negligent infliction of emotional distress theory. . . .

3    *Christensen*, 54 Cal.3d at 905-906, 2 Cal.Rptr.2d 79 (citations omitted.)

4        "Whether a defendant's conduct can reasonably be found to be outrageous is a question of law

5    that must initially be determined by the court; if reasonable persons may differ, it is for the jury to

6    determine whether the conduct was, in fact, outrageous." *Berkley v. Dowds,* 152 Cal.App.4th 518, 534,

7    61 Cal.Rptr.3d 304 (2007).   There is no bright line standard for judging outrageous conduct, and a

8    case-by-case appraisal of conduct is required.   *Cochran*, 65 Cal.App.4th at 494, 76 Cal.Rptr.2d 540.

9        NIED is a form of the tort of negligence, to which the elements of duty, breach of duty, causation

10   and damages apply.   *Huggins v. Longs Drug Stores California, Inc.*, 6 Cal.4th 124, 129, 24 Cal.Rptr.2d

11   587 (1993).   California law recognizes that "there is no independent tort of negligent infliction of

12   emotional distress" in that "[t]he tort is negligence, a cause of action in which a duty to the plaintiff is

13   an essential element." *Potter v. Firestone Tire & Rubber Co.*, 6 Cal.4th 965, 984, 25 Cal.Rptr.2d 550

14   (1993).   The existence of a duty is a question of law.   *Marlene F. v. Affiliated Psychiatric Medical*

15   *Clinic, Inc.,* 48 Cal.3d 583, 588, 257 Cal.Rptr. 98 (1989).

16       NIED includes "at least two variants of the theory" – "bystander" cases and "direct victim" cases.

17   *Wooden v. Raveling*, 61 Cal.App.4th 1035, 1037, 71 Cal.Rptr.2d 891, 892 (1998).   "The distinction

18   between the 'bystander' and the 'direct victim' cases is found in the source of the duty owed by the

19   defendant to the plaintiff." *Burgess v. Superior Court*, 2 Cal.4th 1064, 1072, 9 Cal.Rptr.2d 615 (1992).

20   "Bystander" claims are typically based on breach of a duty owed to the public in general (*Christensen*

21   *v. Superior Court*, 54 Cal.3d 868, 884, 2 Cal.Rptr.2d 79 (1991)), whereas a right to recover for emotional

22   distress as a "direct victim" arises from the breach of a duty that is assumed by the defendant or imposed

23   on the defendant as a matter of law, or that arises out of the defendant's preexisting relationship with the

24   plaintiff (*Burgess*, 2 Cal.4th at 1073-1074, 9 Cal.Rptr. 615; *Marlene F.*, 48 Cal.3d at 590, 257 Cal.Rptr.

25   98).   "[B]ystander liability is premised upon defendant's violation of a duty not to negligently cause

26   emotional distress to people who observe conduct which causes harm to another." *Burgess*, 2 Cal.4th

27   at 1073, 9 Cal.Rptr. 615.

28       "'Bystander' cases are cases in which the plaintiff was not physically impacted or injured, but

38

1  instead witnessed someone else being injured due to defendant's negligence." *Wooden*, 61 Cal.App.4th

2  at 1037, 71 Cal.Rptr.2d at 892. "'Direct victim' cases are cases in which the plaintiff's claim of

3  emotional distress is not based upon witnessing an injury to someone else, but rather is based upon the

4  violation of a duty owed directly to the plaintiff." *Wooden*, 61 Cal.App.4th at 1038, 71 Cal.Rptr.2d at

5  893-894. In "direct victim" cases, "well-settled principles of negligence are invoked to determine

6  whether all elements of a cause of action, including duty, are present in a given case." *Burgess*, 2

7  Cal.4th at 1073, 9 Cal.Rptr.2d 615. "[U]nless the defendant has assumed a duty to plaintiff in which the

8  emotional condition of the plaintiff is an object, recovery is available only if the emotional distress arises

9  out of the defendant's breach of some other legal duty and emotional distress is proximately caused by

10  that breach of duty." *Potter*, 6 Cal.4th at 985, 25 Cal.Rptr.2d 550.

11  　　Defendants attack plaintiffs' lack of "severe or extreme emotional distress" to support their IIED

12  and NIED claims. Defendants note plaintiffs' absence of treatment for emotional distress in connection

13  with the events at issue. Defendants contend as inadequate Mr. Hillbloom's biweekly dreams of his

14  arrest and nervousness about peace officers, Mrs. Hillbloom's concerns about a timely response by the

15  Sheriff's Department, and Michael's feeling badly for Mr. and Mrs. Hillbloom and nervousness over

16  Sheriff's Department patrol boats.

17  　　"With respect to the requirement that the plaintiff show severe emotional distress, this court has

18  set a high bar." *Hughes v. Pair*, 46 Cal.4th 1035, 1051, 209 P.3d 963 (2009). "Severe emotional

19  distress means 'emotional distress of such substantial quality or enduring quality that no reasonable

20  [person] in civilized society should be expected to endure it.'" *Potter*, 6 Cal.4th at 1004, 25 Cal.Rptr.2d

21  550.

22  　　Plaintiffs offer little meaningful to support their NIED and IIED claims. Plaintiffs note that a

23  "reasonable jury could find" that Deputy Carey and Sgt. Broughton "acted with the intention of causing

24  Mr. Hillbloom emotional distress and/or with reckless disregard of the possibility of cause [sic] Mr.

25  Hillbloom and his family extreme emotion [sic] distress." Plaintiffs identify no specific conduct of

26  Deputy Carey or Sgt. Broughton except fleeting references to "actions on the night of his arrest" and

27  "fabrication of facts in the reports that led to the prosecution of Mr. Hillbloom."

28  　　This Court is at a loss as to what specific conduct plaintiffs claim is outrageous to cause severe

emotional distress.  The crux of plaintiffs' purported emotional distress appears to arise from the events surrounding Mr. Hillbloom's arrest.  Mr. Hillbloom's deposition testimony points merely to bi-weekly dreams. Mrs. Hillbloom testified about her concern over timely Sheriff's Department response to a call. Michael noted nervousness about seeing Sheriff's Department officers patrolling near his home. Plaintiffs' interrogatory responses offer platitudes and generalities with little connection to specific alleged wrongdoing. The record reveals plaintiffs' distress with the events at issue but lacks a requisite causal connection in the absence of plaintiffs' identification of defendants' specific acts.  Defendants negate, and plaintiffs fail to raise factual issues as to, IIED and NIED elements to warrant summary adjudication for defendants on the claims.

### False Arrest/Imprisonment

The FAC's (fifth) "False Arrest and False Imprisonment" claim alleges that Deputy Carey and Sgt. Broughton "lacked reasonable cause to arrest and take custody" of Mr. Hillbloom and "unlawfully detained, arrested and jailed" Mr. Hillbloom.

Plaintiffs point out that false arrest arises "when a man intentionally deprives another of his liberty without the other's consent and without adequate legal justification." *Sullivan v. County of Los Angeles*, 12 Cal.3d 710, 718, 117 Cal.Rptr. 241 (1974).

Defendants contend that Sgt. Broughton is not subject to the false arrest/imprisonment claim in that Sgt. Broughton "had no involvement in the arrest."  Plaintiffs respond that "Sgt. Broughton, knowing what he knew at the time of Mr. Hillbloom's arrest, had inadequate legal justification for allowing Deputy Carey to take Mr. Hillbloom to jail."

Plaintiffs fail to identify what Sgt. Broughton "knew."  The record reflects that Deputy Carey informed Sgt. Broughton that Mr. Hillbloom obstructed Deputy Carey and initiated physical contract to result in Mr. Hillbloom's arrest.  Plaintiffs fail to raise a factual issue as to inadequate legal justification to detain Mr. Hillbloom given that Deputy Carey briefed Sgt. Broughton on Deputy Carey's version of the events.  Defendants negate the inadequate legal justification element in the absence of meaningful challenge to what Sgt. Broughton purportedly knew. Sgt. Broughton is entitled to summary adjudication on the false arrest and false imprisonment claim.

### The County's *Monell* Liability

The section 1983 claim attempts to impose *Monell* liability in that the "County had hiring, training, discipline and reassignment policies that amounted to deliberate indifference to the rights of the persons with whom its Sheriff's deputies are likely to come into contact, expressed in its deliberate policies of hiring officers known to be unfit for law enforcement work and failing adequately to train, discipline or reassign such officers in order to prevent injury to members of the public."

A local government unit may not be held liable for the acts of its employees under a respondeat superior theory. *Monell*, 436 U.S. at 691, 98 S.Ct. 2018; *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1443 (9th Cir. 1989). "Federal case law has long barred respondeat superior liability against state actors in suits brought under 42 U.S.C. § 1983." *Fed. of African American Contractors v. City of Oakland*, 96 F.3d 1204, 1214 (9th Cir. 1996). Claimants suing state actors under 42 U.S.C. § 1983 "must establish that their alleged injury was the result of a 'policy or custom' of that state actor." *African American Contractors*, 96 F.3d at 1215.

"[A] municipality cannot be held liable *solely* because it employs a tortfeasor." *Monell*, 436 U.S. at 691, 98 S.Ct. at 2018. The local government unit "itself must cause the constitutional deprivation." *Gilette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992), *cert. denied*, 510 U.S. 932, 114 S.Ct. 345 (1993). Because liability of a local governmental unit must rest on its actions, not the actions of its employees, a plaintiff must go beyond the respondeat superior theory and demonstrate that the alleged constitutional violation was the product of a policy or custom of the local governmental unit. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197 (1989); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478-480, 106 S.Ct. 1292 (1986). To maintain a civil rights claim against a local government, a plaintiff must establish the requisite culpability (a "policy or custom" attributable to municipal policymakers) and the requisite causation (the policy or custom as the "moving force" behind the constitutional deprivation). *Monell*, 436 U.S. at 691-694, 98 S.Ct. 2018; *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002).

"In addition, a local governmental entity may be liable if it has a 'policy of inaction and such inaction amounts to a failure to protect constitutional rights.'" *Lee v. City of Los Angeles*, 250 F.3d 668, 681 (9th Cir. 2001) (quoting *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992)). A local government

1   entity may be liable under section 1983 "if its deliberate policy caused the constitutional violation

2   alleged." *Blankenhorn*, 485 F.3d at 484.   However, "[l]iability for improper custom may not be

3   predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration,

4   frequency and consistency that the conduct has become a traditional method of carrying out policy."

5   *Trevino v. Gates,* 99 F.3d 911, 918 (9th Cir. 1995), *cert. denied*, 520 U.S. 1117, 117 S.Ct. 1249 (1997).

6                                        ***Sgt. Broughton***

7          Relying on points discussed above regarding his lack of direct participation, defendants argue

8   that a *Monell* claim as to Sgt. Broughton fails given the absence of "an underlying constitutional

9   violation committed by Sergeant Broughton."   Plaintiffs do not appear to champion *Monell* liability as

10  to Sgt. Broughton, and no basis for it appears in the record to entitle Sgt. Broughton to summary

11  adjudication on *Monell* liability.

12                                       ***Hiring Practices***

13         Defendants contend that *Monell* liability cannot be established based on the County's hiring

14  practices given evidence "that the Sheriff's Department has a very detailed and stringent hiring process"

15  and the lack of "evidence that the hiring practices and policies of the Sheriff's Department amounted

16  to deliberate indifference to Mr. Hillbloom's constitutional rights, or that they were the moving force

17  behind any constitutional violations."   Defendants hold plaintiffs to more than "identify conduct

18  attributable to the Sheriff's Department, or claim that the Sheriff's Department did not exercise due care

19  in hiring Deputy Carey."   Defendants hold plaintiffs to "establish that the Sheriff's Department was the

20  'moving force' behind Mr. Hillbloom's alleged injuries through the Sheriff's Department [sic]

21  deliberately indifferent conduct."   Defendants note the lack of evidence of "inadequate screening" of

22  Deputy Carey as an applicant or that "the decision to hire Deputy Carey 'reflected a conscious disregard

23  for a high risk' that Deputy Carey would use excessive force on Mr. Hillbloom."

24         In *Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 411, 117 S.Ct. 1382

25  (1997), the U.S. Supreme Court explained "deliberate indifference" in hiring:

26         A plaintiff must demonstrate that a municipal decision reflects deliberate indifference
           to the risk that a violation of a particular constitutional or statutory right will follow the
27         decision. Only where adequate scrutiny of an applicant's background would lead a
           reasonable policymaker to conclude that the **plainly obvious consequence** of the
28         decision to hire the applicant would be the **deprivation of a third party's federally**

                                                  42

**protected right** can the official's failure to adequately scrutinize the applicant's background constitute "deliberate indifference."  (Bold added.)

Thus, "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."  *Brown*, 520 U.S. 397, 404, 117 S.Ct. 1382.  As such, a "lawful hiring decision can launch a series of events that ultimately cause a violation of federal rights. Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee."  *Brown*, 520 U.S. at 405, 117 S.Ct. 1382.

In *Brown*, 520 U.S. at 415, 117 S.Ct. 1382, the U.S. Supreme Court highlighted:

Cases involving constitutional injuries allegedly traceable to an ill-considered hiring decision pose the greatest risk that a municipality will be held liable for an injury that it did not cause. In the broadest sense, every injury is traceable to a hiring decision. Where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into respondeat superior liability. As we recognized in *Monell* and have repeatedly reaffirmed, Congress did not intend municipalities to be held liable unless deliberate action attributable to the municipality directly caused a deprivation of federal rights. A failure to apply stringent culpability and causation requirements raises serious federalism concerns, in that it risks constitutionalizing particular hiring requirements that States have themselves elected not to impose.

Defendants contend that although the County may have been alerted to matters that Deputy Carey was "an extremely poor candidate," such matters did not make "plainly obvious" that Deputy Carey allegedly would "falsely arrest and use excessive force on Mr. Hillbloom."  Defendants accuse plaintiffs of wrongly "attempting to impose de facto vicarious liability on the County."

The County has highlighted its detailed hiring practices to avoid *Monell* liability based on hiring Deputy Carey.  Plaintiffs appear to recognize the absence of evidence to support deliberate indifference as to its hiring decision in that plaintiffs "dismiss" the hiring portion of their section 1983 claim.  As such, defendants are entitled to summary adjudication on a section 1983 hiring claim.

### *Training Practices*

Defendants contend that Sheriff's Department policies and practices fail to support a claim that Deputy Carey or Sgt. Broughton "were inadequately trained or that the County of Fresno was deliberately indifferent in their training."

"[I]nadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come in contact." *Harris*, 489 U.S. at 388, 109 S.Ct. 1197. "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Harris*, 489 U.S. at 389, 109 S.Ct. 1197. Moreover, "it is therefore difficult in one sense even to accept the submission that someone pursues a 'policy' of 'inadequate training,' unless evidence be adduced which proves that the inadequacies resulted from conscious choice – that is, proof that the policymakers deliberately chose a training program which would prove inadequate. And in the second place, some limitation must be placed on establishing municipal liability through policies that are not themselves unconstitutional . . ." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823, 105 S.Ct. 2427 (1985).

The U.S. Supreme Court has elaborated on an inadequate training claim:

> But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.
>
> In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program.

*Harris*, 489 U.S. at 390-391, 109 S.Ct. 1197 (footnotes omitted).

As to failure to train employees, the Ninth Circuit has explained:

> The custom or policy of inaction, however, must be the result of a "conscious," . . . or "'deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.'"
>
> . . .
>
> A local governmental entity's failure to train its employees can also create § 1983 liability where the failure to train "amounts to deliberate indifference to the rights of persons" with whom those employees are likely to come into contact. . . . "[F]or liability to attach in this circumstance the identified deficiency in a [local governmental entity's] training program must be closely related to the ultimate injury." . . . In other words, a plaintiff must show that his or her constitutional "injury would have been avoided" had

1   the governmental entity properly trained its employees. . . .

2   *Lee*, 250 F.3d at 681 (citations omitted.)

3   A section 1983 plaintiff alleging a policy of failure to train peace officers must show: (1) he/she

4   was deprived of a constitutional right; (2) the local government entity had a training policy that amounts

5   to deliberate indifference to constitutional rights of persons' with whom its peace officers are likely to

6   come into contact; and (3) his/her constitutional injury would have been avoided had the local

7   government unit properly trained those officers. *Blankenhorn*, 485 F.3d at 463. "[A]bsent evidence of

8   a 'program-wide inadequacy in training,' any shortfall in a single officer's training 'can only be

9   classified as negligence on the part of the municipal defendant – a much lower standard of fault than

10  deliberate indifference.'" *Blankenhorn*, 485 F.3d at 484-485 (quoting *Alexander v. City and County of*

11  *San Francisco,* 29 F.3d 1355, 1367 (9th Cir. 1994)).

12  In short, "the identified deficiency in a city's training program must be closely related to the

13  ultimate injury." *Harris*, 489 U.S. at 391, 109 S.Ct. 1197.

14  Defendants contend that since Deputy Carey and Sgt. Broughton's training "exceeded POST

15  requirements," nothing indicates "that greater training could have prevented the subject incident."

16  The record lacks evidence of broad ranging inadequate training in the Sheriff's Department.

17  Perhaps recognizing the absence of evidence of deliberate indifference as to training, plaintiffs "dismiss"

18  a section 1983 based on "training policies." As such, defendants are entitled to summary adjudication

19  on a section 1983 training claim.

20  ***Supervision Practices***

21  Relying on *Harris*, 489 U.S. 388-389, 109 S.Ct. 1197, defendants argue that a local government

22  unit is subject to section 1983 liability for failure to supervise reflected by its "deliberate" or "conscious"

23  choice or "policy" amounting to a "deliberate indifference to the rights of persons with whom the police

24  come into contact." Defendants point to an absence of evidence of inadequate supervision of deputies,

25  including Deputy Carey, to equate to "deliberate indifference, or that any possible inadequacy related

26  to supervision could have caused the subject incident." Defendants rely on the Sheriff's Department's

27  probationary period, supervision through chain of command, evaluations, training on policies and

28  procedures, Internal Affairs investigations, critical incident reports, and maintenance of files on

45

individual deputies.

Plaintiffs appear to base their section 1983 supervision claim on "lack of an effective personnel tracking system, in contradistinction to widespread use of such systems by other departments over the last thirty years."

Plaintiffs fail to demonstrate or raise factual issues how absence of a tracking system resulted in plaintiffs' alleged constitutional deprivations. The record reveals that the absence of a tracking system is not closely related to alleged ultimate injury. Without support for a causal connection, defendants are entitled to summary adjudication on a section 1983 supervision claim.

### Negligent Employment, Training And Supervision

The FAC's sixth claim alleges that Sgt. Broughton "negligently and carelessly failed properly to hire, train, assign, discipline and/or control" Deputy Carey to enable him "to use excessive, unnecessary and unreasonable force on members of the public, to make warrantless unlawful arrests based on fabricated probable cause or attempt to cause the fraudulent and malicious criminal prosecution of innocent citizens."

Defendants seek summary adjudication of the negligent hiring, training and supervision claim against Sgt. Broughton in absence of legal support for it. Defendants fault the absence of evidence "to show that Sergeant Broughton's conduct resulted in injury to Mr. Hillbloom."

Under the California Government Claims Act ("Claims Act"), Cal. Gov. Code, §§ 810, et seq., "a public employee is liable for injury caused by his act or omission to the same extent as a private person," "[e]xcept as otherwise provided by statute." However, the Claims Act does not provide that a public entity is liable for its own conduct or omission to the same extent as a private person or entity. *Zelig v. County of Los Angeles*, 27 Cal.4th 1112, 1128, 119 Cal.Rptr.2d 709, 722 (2002). California Government Code section 815(a) provides that a "public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person," "[e]xcept as otherwise provided by statute."

"A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee . . ." Cal. Gov. Code, § 815.2(a).

46

1    However, "a public entity is not liable for an injury resulting from an act or omission of an employee

2    of the public entity where the employee is immune from liability," [e]xcept as otherwise provided by

3    statute." Cal. Gov. Code, § 815.2(b).  Thus, California Government Code section 815 .2 "makes a

4    public entity vicariously liable for its employee's negligent acts or omissions within the scope of

5    employment." *Eastburn v. Regional Fire Protection Authority*, 31 Cal.4th 1175, 1180, 80 P.3d 656

6    (2003).  California "grants immunity to counties only where the public employee would also be

7    immune." *Robinson v. Solano County*, 278 F.3d 1007, 1017 (9th Cir. 2002).  However, "liability of the

8    employer only attaches if and when it is adjudged that the employee was negligent," and, although

9    "public entities always act through individuals, that does not convert a claim for direct negligence into

10   one based on vicarious liability."   *Munoz v. City of Union City*, 120 Cal.App.4th 1077, 1113, 16

11   Cal.Rptr.3d 521, 547 (2004).

12        In sum, the Claims Act's intent "is not to expand the rights of plaintiffs in suits against

13   governmental entities, but to confine potential governmental liability to rigidly delineated

14   circumstances." *Brown v. Poway Unified School Dist.*, 4 Cal.4th 820, 829, 15 Cal.Rptr.2d 679 (1993);

15   *see Eastburn*, 31 Cal.4th at 1183, 80 P.3d 656.   ("common law principles were insufficient to support

16   a *direct* action in tort against a public entity"); *Becerra v. County of Santa Cruz*, 68 Cal.App.4th 1450,

17   1457, 81 Cal.Rptr.2d 165 (1998) ("in absence of some constitutional requirement, public entities may

18   be liable *only* if a statute declares them to be liable");   *Michael J. v. Los Angeles County Dept. of*

19   *Adoptions*, 201 Cal. App.3d 859, 866, 247 Cal.Rptr. 504  (1988) ("Under the Act, governmental tort

20   liability must be based on statute; all common law or judicially declared forms of tort liability, except

21   as may be required by state or federal Constitution, were abolished.")

22        Defendants argue that plaintiffs lack a cognizable negligent employment, training and

23   supervision claim against Sgt. Broughton because neither a public entity nor a public employee can be

24   liable for negligent training and supervision.  Defendants note that "because a claim of negligent hiring,

25   training, and supervision is, in reality, one against the entity itself, a plaintiff cannot avoid this bar to suit

26   by alleging vicarious liability under California Government Code section 815.2(a)." *See Sanders v. City*

27   *of Fresno*, 2006 WL 1883394, at *12 (E.D. Cal. 2006) ("Since the claims against Chief Dyer for

28   negligent training, retention, discipline, etc. are in reality a direct claim against the City, there is no

vicarious liability for Chief Dyer's alleged negligent training, retention, hiring, etc.") Defendants continue that a negligent employment, training and supervision claim cannot be asserted against a public employee "for vicarious liability purposes."  *See Justin v. City and County of San Francisco*, 2008 WL 1990819, at *11 (N.D. Cal. 2008) ("Because Plaintiffs have not identified any statutory basis for liability against the City, summary judgment is appropriate as to this claim" against municipal police chief and others.)

Plaintiffs agree to dismiss their sixth claim to the extent that it "alleges that defendants negligently and carelessly failed properly to train defendant CAREY."  However, plaintiffs appear to continue to assert a negligent hiring claim based on Deputy Carey's "multiple prior arrest for assaultive behavior," "admitted drug use," "other conduct signaling unfitness for law enforcement work," and two prior rejections of Deputy Carey's applications.  Plaintiffs further appear to continue to assert a failure to supervise claim in the absence of an "early warning or early alert system" to track personnel misconduct.  Plaintiffs contend that Deputy Carey's "supervisors were either unaware or indifferent to his history of misconduct that signaled a dangerous inability to manage his anger" and "supervisors, including Sgt. Broughton, did not factor Carey's apparent tendencies to violence."

The sixth claim's negligent hiring and failure to supervise claims are limited to Sgt. Broughton given the judgments in favor of the other individual defendants who appear in the claim's heading and the dismissal of the claim against the County in this Court's prior order.  Plaintiffs have identified no facts to support a negligent hiring claim against Sgt. Broughton in the apparent absence of his authority to hire deputies.  Plaintiffs have identified no law to support a negligent supervision claim against Sgt. Broughton to provide apparent explanation for their devotion to matters regarding Deputy Carey's ills. By naming Sgt. Broughton to the sixth claim, plaintiffs essentially allege a vicarious liability claim against the County.  Plaintiffs seek an end run around the County's limited liability in the absence of a statute to support a negligent employment, training or supervision claim against the County.  Sgt. Broughton is entitled to summary adjudication on the negligent employment, training and supervision claim.  Plaintiffs' reliance on Doe defendants' potential knowledge is unavailing as this action has progressed well beyond the point to amend to identify Doe defendants.

/ / /

## **CONCLUSION AND ORDER**

For the reasons discussed above, this Court:

1.  DENIES Deputy Carey summary adjudication on section 1983 liability for unlawful entry of Mr. and Mrs. Hillbloom's home;

2.  GRANTS Sgt. Broughton summary adjudication on section 1983 liability for unlawful entry of Mr. and Mrs. Hillbloom's home;

3.  DENIES Deputy Carey summary adjudication that he is entitled to qualified immunity as to section 1983 liability for unlawful entry of Mr. and Mrs. Hillbloom's home;

4.  GRANTS defendants summary adjudication as to section 1983 liability for denial of medical care;

5.  GRANTS defendants summary adjudication as to section 1983 liability for conspiracy;

6.  GRANTS Sgt. Broughton summary adjudication as to section 1983 liability for excessive force;

7.  GRANTS defendants summary adjudication on plaintiffs' IIED and NIED claims;

8.  GRANTS Sgt. Broughton summary adjudication on Mr. Hillbloom's false arrest and false imprisonment claim;

9.  GRANTS Sgt. Broughton summary adjudication on *Monell* liability;

10. GRANTS defendants summary adjudication as to section 1983 liability for hiring Deputy Carey;

11. GRANTS defendants summary adjudication as to section 1983 liability for training;

12. GRANTS defendants summary adjudication as to section 1983 liability for supervision; and

13. GRANTS Sgt. Broughton summary adjudication on the negligent employment, training and supervision claim.

As a result, plaintiffs' remaining claims are limited to:

/ / /

/ / /

/ / /

49

1.     Plaintiffs' (first) section 1983 claims against Deputy Carey only;[21]

2.     Mr. Hillbloom's (second) assault and battery claim against Deputy Carey only; and

3.     Mr. Hillbloom's (fifth) false arrest and false imprisonment claim against Deputy Carey only.

This Court DIRECTS the clerk to enter judgment in favor of defendants County of Fresno and Eric Broughton and against plaintiffs Terry Hillbloom, Sandra Hillbloom and Michael Leon in that there is no just reason to delay to enter such judgment given plaintiff's claims against the County and Sgt. Broughton and the County and Sgt. Broughton's alleged liability are clear and distinct from claims against and liability of other defendant(s). *See* F.R.Civ.P. 54(b).

This Court further CONFIRMS the December 2, 2010 pretrial conference and February 14, 2011 trial.


IT IS SO ORDERED.

**Dated:**   **November 1, 2010**             **/s/ Lawrence J. O'Neill**
                                         UNITED STATES DISTRICT JUDGE

---

[21]    Mrs. Hillbloom and Michael's remaining section 1983 claims are limited to unlawful entry to the extent cognizable.